IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
                                   ) Case No.
      vs.                          ) 8:18-CR-00234-MSS-SPF
                                   )
                                   )
CHRISTOPHER BRIAN COSIMANO and )
MICHAEL DOMINICK MENCHER,          )
                                   )
            Defendants.            )

_____

JURY TRIAL – DAY 8
BEFORE THE HONORABLE MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

AUGUST 8, 2019
COMMENCING AT 9:20 A.M.
TAMPA, FLORIDA
_____




Proceedings recorded by mechanical stenography,
transcript produced using computer-aided transcription.
_____

DAVID J. COLLIER, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
801 NORTH FLORIDA AVENUE, 7TH FLOOR
TAMPA, FLORIDA  33602

```
 1   APPEARANCES:

 2

 3   FOR THE GOVERNMENT:

 4           Carlton Gammons
             Natalie Hirt Adams
 5           United States Attorney's Office
             400 N. Tampa Street, Suite 3200
 6           Tampa, Florida  33602
             (813) 274-6000
 7

 8   FOR THE DEFENDANT CHRISTOPHER BRIAN COSIMANO:

 9           J. Jervis Wise
             Bjorn E. Brunvand, P.A.
10           615 Turner Street
             Clearwater, Florida  33756
11           (727) 446-7505

12

13   FOR THE DEFENDANT MICHAEL DOMINICK MENCHER:

14
             Anne F. Borghetti
15           Anne F. Borghetti, P.A.
             12211 49th Street North, Suite 1
16           Clearwater, Florida  33762-4300
             (727) 502-0300
17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X
2
3                                                    PAGE
4   Closing argument by Mr. Gammons               11
5   Closing argument by Mr. Wise                  33
6   Closing argument by Ms. Borghetti             59
7   Rebuttal argument by Mr. Gammons              74
8
9   Final instructions by the Court               80
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              P R O C E E D I N G S
 2                 - - - o0o - - -
 3         THE COURT:  Good morning.  Call the case, please.
 4         COURTROOM DEPUTY:  Court calls Case Number
 5   8:18-CR-234-T-35SPF, the United States of America versus
 6   Christopher Brian Cosimano and Michael Dominick Mencher.
 7         Counsel, please state your appearances for the
 8   record, starting with counsel for the Government.
 9         MR. GAMMONS:  Good morning, Your Honor.
10   Carlton Gammons and Natalie Adams on behalf of the
11   United States.
12         THE COURT:  Good morning.
13         MR. WISE:  Good morning, Your Honor.  Jervis Wise
14   on behalf of Mr. Cosimano.
15         THE COURT:  Good morning.
16         MS. BORGHETTI:  Good morning, Your Honor.
17   Anne Borghetti on behalf of Michael Mencher.
18         THE COURT:  Good morning.
19         I trust the parties received the draft of the jury
20   instructions last evening; is that right?
21         MR. GAMMONS:  Yes, ma'am.
22         MR. WISE:  Yes, Your Honor.
23         MS. BORGHETTI:  Yes, Your Honor.
24         THE COURT:  Since you got that draft I did a final
25   read-through and I removed the title of the instruction that
```

1    speaks to the *Zaffiro* case.  I just took the case name off

2    of it so it doesn't have a title.  So "caution, punishment"

3    will just be first and then it will just start with "I want

4    to emphasize that."  I think it's dangerous to suggest the

5    jury go to cases.  And then -- any objection to that from

6    the Government?

7             MR. GAMMONS:  No, ma'am.

8             MR. WISE:  No, Your Honor.

9             MS. BORGHETTI:  No, Your Honor.

10            THE COURT:  And then on page -- well, it's my 17,

11    but it's crime of violence in aid of racketeering, I guess

12    that's a borrowed instruction from the Fifth Circuit, and I

13    noticed in the last read-through that in the reference to --

14    the paragraph starts "although the enterprise must be

15    separate and apart," which is sort of the second page of the

16    instruction, about halfway down, it references pattern of

17    racketeering, and pattern is not required in the

18    racketeering under 1959, and so I propose removing the word

19    "pattern" of racketeering and just say although the

20    enterprise must be separate and apart from the racketeering

21    activity, et cetera.  Is that acceptable to the Government?

22            MR. GAMMONS:  Yes, ma'am.

23            THE COURT:  To the defense?

24            MR. WISE:  Yes, Your Honor.

25            MS. BORGHETTI:  Yes, Your Honor.

```
 1              THE COURT:  All right.  In the brandishing
 2   instruction, although we've already defined brandishing, it
 3   just seems odd there not to explain what brandishing is in
 4   the context of the precise instruction, so I've just pulled
 5   over the definition of to brandish from the substantive
 6   instruction.  Any objection from the Government?
 7              MR. GAMMONS:  No, ma'am.
 8              MR. WISE:  No, Your Honor.
 9              MS. BORGHETTI:  No, Your Honor.
10              THE COURT:  How did I get to be a ma'am,
11   Mr. Gammons, since yesterday?
12              Discharge of a firearm.  There is no definition of
13   discharge, so I just went to the dictionary and it says, and
14   I wrote:  To discharge a firearm means to cause the weapon
15   to fire and expel the projectile.
16              Is that sufficient for the Government?
17              MR. GAMMONS:  Yes, Your Honor.
18              MR. WISE:  Yes, Your Honor, it is.
19              MS. BORGHETTI:  Yes, Your Honor.
20              THE COURT:  All right.  And then in regard to the
21   indictment correction, this is what I propose to say to the
22   jury:  When the Court initially read the charges in the
23   second superseding indictment it contained references to
24   cocaine, marijuana and methamphetamine.  Those substances
25   are no longer at issue in this case.
```

1        I should probably say with respect to Count

2   whatever it is, Count Nine?

3        MS. BORGHETTI:  Count Nine, Your Honor.

4        THE COURT:  With respect to Count Nine and have

5   been removed from the second superseding indictment.  The

6   only substance that remains at issue in Count Nine of the

7   second superseding indictment is heroin.

8        Is that acceptable to the defense?

9        MS. BORGHETTI:  Yes, Your Honor.

10       THE COURT:  What about the Government?

11       MR. GAMMONS:  Yes, Your Honor.

12       THE COURT:  And Mr. Cosimano, I assume, would have

13  no concern about that part?

14       MR. WISE:  Correct, Your Honor.

15       THE COURT:  All right.  Thank you.

16       And those are all of the proposed changes to the

17  instructions.  We will clean those up and get the final

18  draft before we start the closing.

19       Ms. Fowler, did you catch all of that?

20       MS. FOWLER:  Yes, Judge.

21       THE COURT:  With respect to Mr. Mencher, the Court

22  has gone back and reread the transcript, the rough

23  transcript of the testimony of Mr. Guinto and Mr. Leonard.

24  Mr. Guinto did testify as the Government recalled, and we

25  discussed Mr. Leonard's testimony.  If both of those or

1  perhaps either one of those witnesses would be believed by

2  the jury, it would be sufficient evidence to convict a

3  conspiracy to traffic in heroin, and so the Court would deny

4  the motion for judgment of acquittal as to that count.

5           Was there any other outstanding issue the Court

6  needed to address before we re-call the jury?

7           MS. ADAMS:  Your Honor, this morning we caught an

8  additional error in the redaction of the indictment.

9  I believe the courtroom deputy now has a corrected one that

10 reflects that Michael Mencher is only being charged with a

11 single controlled substance in Count Nine.  Defense and the

12 courtroom deputy have the new revision as of this morning.

13          Also --

14          THE COURT:  What did it say before?

15          MS. ADAMS:  We had discussed yesterday changing

16 did knowingly, willfully and intentionally conspire with

17 other persons to possess with intent to distribute

18 controlled substances.

19          THE COURT:  So the "S" was taken off.

20          MS. ADAMS:  And now it says possess with intent to

21 distribute a controlled substance.

22          THE COURT:  All right.

23          MS. ADAMS:  That's been fixed.

24          You also asked us to fly spec the verdict forms.

25 I did find an error on page 3 of Mr. Mencher's verdict form.

1  It instructed the jury, if it were to find Mr. Mencher
2  guilty of the count charged in Count Four, to proceed to
3  Count Six.  It should say Count Nine.  On the last paragraph
4  of page 3 there are two references to Count Six, each should
5  be changed to Count Nine.
6          THE COURT:  All right.  I think we caught both of
7  those last evening as well, so we'll make those changes on
8  the second superseding indictment redaction, which I think
9  you've given us a copy of that, and then we'll fix the
10 verdict form.
11         Is that acceptable to the defense, Ms. Borghetti?
12         MS. BORGHETTI:  Yes, Your Honor.
13         THE COURT:  Anything on Mr. Cosimano's that needs
14 to be corrected?
15         MR. WISE:  No, Your Honor, I don't believe so.
16         THE COURT:  All right.  Is there anything further
17 that we need to address?  We need to get these printed,
18 which will take a minute, and then we'll move directly into
19 re-calling the jury.
20         MR. GAMMONS:  Nothing from the United States,
21 Your Honor.
22         MR. WISE:  No, Your Honor.
23         MS. BORGHETTI:  No, Your Honor.
24         THE COURT:  All right.  As is always the case,
25 Murphy's law, all the printers are down, and so we will move

1    directly into closing and we will read the instructions at

2    the end of closing and that should give our crack Systems

3    people time to get our printers up and going.

4              Any objection from the Government?

5              MR. GAMMONS:  No, Your Honor.

6              MR. WISE:  No, Your Honor.

7              MS. BORGHETTI:  No, Your Honor.

8              THE COURT:  All right.  Please re-call the jury.

9              Will demonstratives be used in closing?

10             MR. GAMMONS:  I'll be playing a PowerPoint.  It

11   includes only exhibits that have been entered into evidence

12   and a summary of the jury instructions.

13             THE COURT:  All right.  From the defense?

14             MR. WISE:  No, Your Honor.

15             MS. BORGHETTI:  No, Your Honor.

16                  *(Jury re-enters proceedings.)*

17             THE COURT:  Welcome back, ladies and gentlemen.

18   We are now getting ready to move into closing arguments or

19   summations.

20             As the Court has previously instructed you, the

21   summation is that part of the case where the Government

22   tries to show you what the Government believes the evidence

23   has shown, and defense counsel will do the same.  Arguments

24   of lawyers, statements of lawyers are not evidence, but they

25   are available to help you understand in their view what has

1   been presented in the case, so the Court would ask you to
2   give them your full attention at this time.
3            We will begin with the Government, we will then go
4   to each defense counsel, and the Government, because it
5   bears the burden of proof, will have an opportunity to make
6   a short rebuttal.  So please give the lawyers your
7   attention.
8            Counsel.
9            MR. GAMMONS:  Thank you, Your Honor.
10           May it please the Court.
11           THE COURT:  Yes, sir.
12           MR. GAMMONS:  Co-counsel.  Defense counsel.
13           Good morning, ladies and gentlemen.
14           JURORS:  Good morning.
15           MR. GAMMONS:  As I'm sure you know, this is an
16   important case.  This is an important case to the
17   United States of America and it's an important case to the
18   defendants.
19           Now, I know that jury service isn't always
20   convenient and in most cases it is inconvenient, so on
21   behalf of the United States I want to thank you for both
22   your time and your attention.
23           The Killsborough chapter of the 69'ers Motorcycle
24   Club is nothing more than a dark and dingy shed in
25   Riverview, Florida behind the home where the defendants

1  Christopher Cosimano and Michael Mencher lived.  On the

2  walls of the clubhouse are pictures of wolves and 69'er

3  members with their middle fingers outstretched, and

4  centrally located in the 69'ers clubhouse is a shirt that

5  hangs on a nondescript white plastic hanger, and that shirt

6  sums up the motto and the mentality of the 69'ers, "Cash,

7  culture and violence."

8          Cash, culture and violence.  Cash generated by the

9  illicit sale of marijuana, methamphetamine, cocaine and

10  heroin, a culture of demanding respect and violence to

11  anybody who came in their path, that is what the 69'ers were

12  all about and that's what the evidence in this case has

13  proved beyond a reasonable doubt.

14          Over the last couple of weeks you have seen

15  hundreds of items of evidence entered into -- entered at

16  this trial, you've heard from several types of witnesses,

17  ranging -- with different sort of backgrounds, including

18  Board certified physicians and convicted murderers.  The

19  United States has done its best to streamline this evidence

20  and present it in a straightforward, concise manner, and now

21  it's my opportunity to summarize the law as it applies to

22  the evidence presented in this case.  I am going to remind

23  you that I am simply going to summarize the law.  The Judge

24  will provide you detailed instructions on the law after the

25  lawyers conclude their summations.

1           The defendants, Mr. Mencher and Mr. Cosimano, are

2     charged collectively in seven counts.  Count One is

3     conspiracy to commit murder, Count Two is murder,

4     Count Three is discharge of a firearm, Count Four is

5     discharge of a firearm causing death, Count Six is assault

6     with a dangerous weapon, Count Seven is discharge of a

7     firearm, and Count Nine is a drug conspiracy.

8           On the top row on the red highlighted boxes, those

9     charge both defendants, Mr. Cosimano and Mr. Mencher, and

10    that's in relation to the homicide of Paul Anderson.

11          Counts Six and Seven are related to the shooting

12    of James Costa, who you've heard him referred to as

13    Jimbo Costa, and that charges only Mr. Cosimano.  Count Nine

14    is a drug conspiracy in which Mr. Mencher is only charged.

15          I want to begin by discussing Counts One, Two and

16    Six.  Those charge what are called violent crimes in aid of

17    racketeering, and basically what they criminalize is when

18    someone commits a violent act on behalf of an enterprise.

19          The Judge is going to instruct you on the law, but

20    I expect that she's going to tell you that there are five

21    elements that have to be met.  The first three elements are

22    enterprise-focused, the fourth and the fifth element are

23    defendant-focused, and they are:  One, the enterprise

24    existed; two, the enterprise engaged in interstate commerce;

25    three, the enterprise engaged in racketeering activity;

```
 1    four, the defendant committed a crime of violence; and five,
 2    the defendant committed the crime of violence to gain
 3    entrance to or to maintain or to increase position in the
 4    enterprise.
 5            Now, ladies and gentlemen, the first element is
 6    the enterprise, and I expect the Judge will instruct you
 7    that an enterprise is simply an association of individuals
 8    for a common purpose.  This group can be lawful, it can be a
 9    bible study, it can be a book club, or it can be unlawful,
10    like the 69'ers were.  In this case the evidence has
11    established beyond a reasonable doubt that the 69'ers
12    motorcycle club was an enterprise.
13            You heard from four former 69'ers during the
14    course of this trial who described the internal structure of
15    the club in great detail, including the Regional Boss for
16    Florida, Arthur Siurano.  He explained to you that he was
17    one of four Regional Bosses, including Jimmy that oversaw
18    the five boroughs, Hillbilly who oversaw Upstate New York,
19    and Pipo who oversaw New Jersey.
20            Mr. Siurano told you that the 69'ers was a
21    1 percent motorcycle club.  He told you that the motorcycle
22    club had been around since the late 1960s.  And
23    Mr. Siurano's testimony was a top-down view of the 69'ers.
24    In that organization there was no one higher than him.
25            Mr. Siurano also presented to you Government's
```

1    Exhibit 404, the Constitution of the 69'ers, which will be
2    available during your deliberations for you to review.
3         Mr. Siurano explained that the 69'ers Constitution
4    covered every aspect of club life, including charters,
5    officers, members, clubhouse, prospects, colors and
6    meetings.
7         Mr. Siurano also showed you that there was a
8    document that's come into evidence as Government's Exhibit
9    405, which is a set of bylaws that he was working on with
10   other Presidents and other Regional Bosses that never became
11   finalized because he was arrested.
12        But in addition to Siurano, you heard from three
13   different 69'ers who were a member of the Killsborough
14   chapter, Sean Leonard, the Vice President; Allan Guinto, the
15   Treasurer; and Cody Wesling, a prospect.  Not only did those
16   members confirm what Mr. Siurano told you, but they also
17   gave you an inside look at how it worked in the Killsborough
18   chapter, including who were officers, how much dues were and
19   how much periodic -- or how often periodic meetings
20   occurred, which they referred to as church.
21        But it's not just the bylaws or even the firsthand
22   testimony, ladies and gentlemen, because you have
23   photographs and evidence linking these two defendants to the
24   criminal enterprise.
25        This is Government's Exhibit 310-3.  It's a

photograph taken at the Warlando clubhouse in Orlando,
Florida.  In the photo you see the 1 percent diamond, you
see dozens of 69'ers wearing their colors, including
Arthur Siurano, Isaac Diaz, Sean Leonard, Erick Robinson and
the defendants circled in red.

This is Government's Exhibit 310-9.  This is at
the Killsborough clubhouse in Riverview, Florida.  Again,
you see the defendants circled in red and their fellow
chapter members, including Allan Guinto and Erick Robinson.
Notably, you'll see two of the four Regional Bosses visiting
from out of state, Arthur Siurano down from Pennsylvania and
Pipo down from New Jersey.

And this is Government's 305-1, a photo taken at
the Bushkill, Pennsylvania clubhouse.  In addition to the
defendants circled in red, you see a number of '69ers from
New York and New Jersey wearing their colors, including the
New York Regional Boss, Hillbilly.

As I said earlier, the enterprise is nothing more
than a group of individuals who associated for a common
purpose, and whether the 69'ers were associating for
fraternity, Harley Davidsons or crime, it is clear that this
has established beyond a reasonable doubt that the 69'ers
were an enterprise.

The second element is interstate commerce.  Now,
I expect that the Judge will instruct you that all that

means is that money, goods or services traveled over
state lines.  That's interstate commerce.  I expect that the
Judge will instruct you that interstate commerce only -- the
activity only has to have a minimal effect on interstate
commerce as well.  Just like the purpose of the enterprise,
interstate commerce may be lawful or unlawful, and I'll tell
you that the 69'ers did both.

Mr. Siurano explained to you, and Sean Leonard did
as well, that the patches that the 69'ers wore on their back
were made in Brooklyn, New York.  What that means is that
every 69'er, whether they were in New York, New Jersey,
Pennsylvania, Florida, Puerto Rico or elsewhere, is wearing
a patch that has traveled outside of the State of New York.

Sean Leonard also testified that he was
trafficking in firearms and silencers from the State of
Florida up to New York, and Allan Guinto testified that he
paid monthly dues in the amount of $50 that were sent to the
Mother Charter in Brooklyn, so this was a regular stream of
cash coming from the Killsborough charter up to the Mother
Charter.

In this case there were firearms, patches and
money traveling out of the State of Florida, and that
satisfies interstate commerce.

Now, moving to the third element, racketeering
activity, I expect that the Judge will instruct you this

1   just means that -- the commission of certain crimes,

2   including drug trafficking.  The testimony presented at this

3   trial establishes beyond a reasonable doubt that the 69'ers

4   as an enterprise were engaged in drug trafficking.

5           Going back to the Regional Boss, Arthur Siurano,

6   he testified that he organized trucks filled with heroin,

7   cocaine, methamphetamine and marijuana from California to

8   New Jersey.  Not only did he testify to this, he has pled

9   guilty in New York to this.  You can look at Government's

10  Exhibit 607, which is his indictment.

11          Mr. Siurano also explained that once those drugs

12  arrived in New York, he arranged for the transportation down

13  to Florida to Isaac Diaz, a 69'er who lived in Orlando, and

14  to Eric Robinson, a 69'er who was a member, the

15  Sergeant-Of-Arms of the Killsborough chapter in Tampa,

16  Florida.

17          Again, you heard testimony from three former

18  69'ers in this case, and it corroborates what Mr. Siurano

19  told you.  Each of these individuals had involvement with

20  drug trafficking involving Mr. Robinson.  Sean Leonard told

21  you on one occasion he transported a bucket of heroin from

22  Tampa to Orlando at the direction of Mr. Robinson.

23  Mr. Guinto told you that he was supplied cocaine by

24  Mr. Robinson.  Cody Wesling, the firefighter, he told you

25  that shortly after becoming a prospect with the club he

1  received a bag of marijuana out of Mr. Robinson's room and

2  delivered it to a third-party at the request of the

3  defendant Christopher Cosimano.

4        From the top, Arthur Siurano, all the way down to

5  the bottom, Cody Wesling, the 69'ers were involved in

6  interstate commerce involving drug trafficking, and the

7  racketeering element is met as well.

8        Now, as I mentioned earlier, the first three

9  elements are enterprise-focused and the fourth and fifth are

10  defendant-focused.  The fourth defendant-focused element is

11  a crime of violence was committed.

12        In this case there are three crimes of violence

13  alleged, the first is conspiracy to commit murder, the

14  second in Count Two is murder, and the third in Count Six is

15  assault with a dangerous weapon.  Counts One and Two relate

16  to the homicide of Paul Anderson.  Count Six relates to the

17  shooting of Jimbo Costa.

18        I want to start with Count Six, the shooting of

19  Jimbo Costa, where only the defendant Christopher Cosimano

20  is charged.

21        I expect that the Judge will instruct you that

22  Count Six has four elements:  First, the defendant

23  intentionally and unlawfully threatened by word or act to do

24  violence to James Costa; second, at the time the defendant

25  appeared to have the ability to carry out the threat; third,

1   the act -- the act of the defendant created in the mind of

2   James Costa a well-founded fear that the violence was about

3   to take place; and fourth, the assault was made with a

4   deadly weapon.

5         Ladies and gentlemen, James Costa was shot at

6   several times and shot twice.  This conduct certainly

7   constitutes an assault with a dangerous weapon.  So let's

8   talk about who was the shooter.

9         I want to begin with Allan Guinto.  Allan Guinto

10  told you that Mr. Cosimano confessed to committing this

11  crime to him.  Early on July 25th, 2017, Mr. Cosimano said

12  that he was going to get one, which Mr. Guinto assumed was a

13  cut from an Outlaw.  Later that same night, Mr. Cosimano

14  called him back and said that he did get one and asked

15  Mr. Guinto to meet him.  When Mr. Guinto met with

16  Mr. Cosimano, Mr. Cosimano said that he had followed

17  James Costa, that he had shot James Costa, and he even gave

18  Mr. Guinto the firearm that he used to shoot James Costa

19  with and directions to destroy that firearm.

20        Now, as you know, Mr. Guinto did not do that.  He

21  gave the firearm to Sean Leonard, Sean Leonard gave it to

22  law enforcement, and now that firearm is in evidence as

23  Government's Exhibit 108.

24        Mr. Guinto was ultimately charged in relation to

25  this crime.  You can look at Government's Exhibit 601, which

 1   is his plea agreement.  Mr. Guinto has pled guilty to
 2   conspiracy to commit murder relating to Paul Anderson,
 3   murder in relation to Paul Anderson, and Count Eight charged
 4   him with accessory after the fact for disposing of that
 5   firearm after James Costa was shot.  But importantly, ladies
 6   and gentlemen, you've seen evidence during this trial that
 7   corroborates what Mr. Guinto told you.
 8          James Costa testified.  He told you that on
 9   July 25th, 2017, he was returning from the Red Tiki, a bar
10   in St. Petersburg, exactly what Mr. Guinto told you.  If you
11   look at Government's Exhibit 107-2, which is a photograph
12   from a toll plaza on the Sunshine Skyway, at 10:14 and
13   39 seconds James Costa is driving through that toll plaza.
14   14 seconds later Mr. Cosimano is driving through that same
15   toll plaza in St. Petersburg, and Mr. Cosimano lives all the
16   way in Riverview.
17          Recall Mr. Costa's testimony.  He said that before
18   his bike lost control he saw a white van behind him matching
19   the description of Mr. Cosimano's.  He said that he heard
20   four or five shots, and then when he saw the white van again
21   it was parked stationary.
22          You also heard testimony from Detective
23   Mike Miller who said that the area where James Costa was
24   shot was 18 miles away from the toll plaza where these
25   photos were taken.  Detective Miller told you that he

 1   believed the shooting was targeted because of the rural area

 2   where it occurred.  And just as Guinto said, this was a

 3   targeted shooting that Mr. Cosimano had planned for hours

 4   and waited til the right location and the right time to

 5   strike.

 6          Last, I want to talk again about Arthur Siurano.

 7   Government's Exhibit 305-8 is a photograph of Mr. Cosimano

 8   and Mr. Siurano.  Mr. Siurano told you that he thought

 9   Mr. Cosimano had nothing to do with James Costa's shooting

10   because Mr. Cosimano's van had been taken, it had been

11   searched, it had been returned, Mr. Cosimano hadn't been

12   arrested.  But it wasn't until the 50th anniversary of the

13   69'ers, a party in New York, conversation over a cigarette,

14   where Mr. Cosimano laughed and said, yeah, I did do that.

15   Because what's the point of shooting an Outlaw if you can't

16   brag about it to your Boss?

17          And take a look at Government's Exhibit 236, the

18   patch on the bottom left.  This is Mr. Cosimano's cut, and

19   he's wearing the 50 year patch, showing that he was present

20   at that event.

21          Ladies and gentlemen, in summary, the evidence is

22   overwhelming that Mr. Cosimano is the person that shot

23   James Costa, and I would ask you to return a verdict of

24   guilty as to that count.

25          Counts One and Two charge conspiracy to commit

1    murder and murder, and they charge both defendants in this

2    case, and that relates to Paul Anderson's shooting.

3            I expect the Judge to instruct you that with

4    regard to Count One, conspiracy to commit murder,

5    two elements are required:  First, two or more persons in

6    some way agreed to try to accomplish a shared and unlawful

7    plan; and second, the defendant knew of the unlawful purpose

8    and willfully joined in it.

9            I also expect that the Judge will instruct you

10   that murder requires three elements.  First, Paul Anderson

11   is dead; second, the death was caused by the criminal act of

12   the defendant; and third, this was a premeditated killing of

13   Paul Anderson.

14           The same evidence supports a conspiracy as well as

15   a murder in this case, the substantive murder counts, One

16   and Two, and that evidence falls into three categories as

17   I see it.  First, there is eyewitness testimony, the second

18   is corroborating video and photographs, and the third is the

19   taped confession of Michael Mencher.

20           I want to start with the eyewitness testimony.

21           Cody Wesling is a firsthand witness to

22   Paul Anderson's murder.  He sat behind Paul Anderson's black

23   Dodge Dakota and watched Christopher Cosimano and

24   Michael Mencher drive their bikes up to it.  Mr. Wesling

25   testified that Mr. Cosimano tapped on the window before

1   firing multiple times into the truck, and then that

2   Mr. Cosimano and Mr. Mencher then fled on their motorcycles.

3   He identified Mr. Cosimano as the shooter, and if you recall

4   from his testimony, that's what he's been telling

5   law enforcement since the first time he was interviewed.

6          The photo on the right, Government's Exhibit 410,

7   was taken by a civilian witness who you heard from named

8   Reginald Robinson moments after the murder, and his

9   testimony corroborated Mr. Wesling's testimony as

10  Mr. Cosimano being the shooter and Mr. Mencher being

11  present.

12          Robinson described -- Reginald Robinson described

13  two bikers to you.  The first biker was in front with a

14  front fairing or a wind cover and bags on the motorcycle

15  that he was driving.  The second biker Reginald Robinson

16  described was smaller and had a more plain bike with

17  lightning bolts on the rear fender.  Robinson testified that

18  after the shooting occurred both motorcycles fled in the

19  same direction.

20          Moving on to the corroborating photograph and

21  video evidence, Government's 223-1 is a photograph of the

22  shooter.  Government's 305-14 is a photograph of

23  Mr. Cosimano's phone showing Mr. Cosimano wearing a

24  distinctive helmet and a distinctive face covering identical

25  to that worn by the shooter.

1          Again, on the left is the shooter.  On the right

2     is Mr. Cosimano's motorcycle.  Look at the similarities, the

3     grips, the wind cover, the lights, the tire.  Identical to

4     the shooter's motorcycle.

5          On the left-hand side, toll plaza photo, the

6     shooter, Government's 223-3, compare it to the photograph on

7     the right.  Mr. Cosimano is the rider on the left and his

8     bags are highlighted in red.  You can see the 1 percent

9     diamond stickers that he removed that left the residue that

10    appears on the photo on the left.

11         Ladies and gentlemen, from the helmet to the face

12    covering to the motorcycle, it is clear that the first biker

13    and the shooter of Paul Anderson is Christopher Cosimano.

14         Now let's talk about Michael Mencher.

15         Government's 223-4 is the second biker.

16    Government's 408-21 is the motor -- is Mr. Mencher's

17    motorcycle.  Look at the distinctive handlebars, which were

18    referred to as Z bars.  Look at the headlight.

19         Again, Government's 211-63, a photograph taken

20    during the search of the Killsborough clubhouse, and these

21    shoes were located in Mr. Mencher's room.  Look at them

22    again.  They're identical.

23         Also you heard testimony that also found in that

24    room, Government's Exhibit 231, a firearm, a 380 Kel-Tec

25    pistol, and 35 rounds of .380 ammunition.

```
 1              What I've just described to you is good evidence,
 2    but you don't have to rely on the testimony of Cody Wesling,
 3    of Reginald Robinson, of toll video and photographs, because
 4    you heard from Mr. Mencher himself.  Mr. Mencher told you
 5    exactly who those bikers were hours after the murder as he
 6    had a conversation that he thought was with a brother from
 7    the club, Sean Leonard.  He didn't know Mr. Leonard was
 8    working for law enforcement at the time.
 9              Ladies and gentlemen, the exhibit is 509-T, the
10    call is about 30 minutes long, and I won't play it all for
11    you, but I encourage you to listen to this call over and
12    over, as many times as you need.
13              In that call Mr. Mencher said that Anderson's
14    murder was Cosimano's plan.  He says that Cosimano told him
15    "this is the only time."  In that call Mr. Mencher says that
16    Wesling was right behind the motorcycles when Mr. Anderson's
17    murder occurred.  Mr. Mencher said that Mr. Guinto was
18    present there as well.  Mr. Mencher refers to the shooting
19    as an assassination.  Mr. Mencher says that afterward he
20    removed the, quote, unquote, cracker bolts from his bike
21    because toll plaza footage had shown it on the news.
22              Those are just highlights, ladies and gentlemen.
23    I want you to listen to this video in its -- or this audio
24    in its entirety if you want to know how this crime was
25    committed and who was involved, but I will play a short clip
```

1   for you.

2                        *(Audio played.)*

3             MR. GAMMONS:  Ladies and gentlemen, I want you to

4   think about that.  A witness says that they pulled up on

5   their bikes, opened fire, and the only issue that

6   Mr. Mencher takes with that statement is he says he didn't

7   get off the bikes.

8             I encourage you to listen to 509 when you go back

9   to the grand jury room.  After you do it, you will know that

10  Mr. Mencher knew about the plan to murder Paul Anderson, he

11  was a part of the plan to murder Paul Anderson, and then

12  afterward he attempted to cover up the murder of

13  Paul Anderson.

14            Before we move on, I want to talk to you about

15  what's called aiding and abetting.  I expect that the

16  Judge -- and this relates to Count Two, the substantive

17  murder charge.  I expect that the Judge will instruct you

18  that aiding and abetting means that a defendant may be held

19  criminally responsible for the acts of another person if the

20  person aids and abets that person.  A defendant aids and

21  abets a person if the defendant intentionally joins with

22  that person to commit a crime.

23            So what does that mean?  That means that if

24  Allan Guinto conducts surveillance of Paul Anderson, follows

25  Paul Anderson, passes along the location of Paul Anderson so

1   that Christopher Cosimano can drive up on him and kill him,

2   then Allan Guinto is just as responsible as Christopher

3   Cosimano.  What that means is if Cody Wesling does the same

4   thing, Cody Wesling is just as responsible as Christopher

5   Cosimano.  And obviously you know that the same applies to

6   Mr. Mencher.

7        But, ladies and gentlemen, I want to go back to

8   509-2.  We know that Mr. Mencher had more of an active role

9   than just surveillance.

10                    *(Audio played.)*

11        MR. GAMMONS:  "If he would have drove away,

12   I would have opened up into the back of him."  "If he would

13   have drove away, I just would have opened up into the back

14   of him."  There is no ambiguity about what that means.

15   Mr. Cosimano was the shooter, Mr. Mencher was backup,

16   Mr. Wesling and Mr. Guinto were surveillance.  This crime

17   doesn't happen without everybody participating, and the law

18   requires that everybody be held responsible.

19        The last element is the purpose of the crime, and

20   I expect that the Judge will explain to you that the purpose

21   of the crime must be to gain entrance to, maintain or

22   increase position in the enterprise, that being the 69'ers,

23   and that's exactly what the evidence has shown in this case.

24        To understand why the defendants would attempt to

25   kill or kill people who had never laid a finger on them, you

1   have to take a step back and look at the overall story.

2          You heard from Mr. Cosimano's post-Miranda

3   interview he tries to hang out with the Outlaws, but

4   apparently he is just not Outlaw material.  After the feared

5   and respected Outlaw chapter in Orlando flips over to

6   69'ers, other clubs start popping up across the state,

7   including the Killsborough chapter.  Sometime around early

8   2017 Mr. Cosimano becomes the President of that chapter.

9   Finally he has the respect from a 1 percent motorcycle club

10  that he's been chasing for years.

11         Then Local Brewing Company happens.  When two of

12  his members are beat down and their cuts taken, it's the

13  ultimate sign of disrespect.  If Mr. Cosimano doesn't

14  respond, the Killsborough charter will be a laughingstock.

15  His chapter won't respect him, the Regional Bosses won't

16  respect him, no 1 percenter will respect him.

17         You heard the testimony of Cody Wesling, the

18  five foot tall firefighter.  He said that if Mr. Cosimano

19  didn't retaliate, he wouldn't have respected him.

20         That's the backdrop to these crimes, ladies and

21  gentlemen.  We have already reviewed the evidence.  You know

22  what happens.  July 25th, 2017, Mr. Cosimano shoots

23  James Costa.  On December 21st, 2017, Mr. Cosimano executes

24  Paul Anderson while he's sitting in rush hour traffic.

25         Where does Michael Mencher fit in?  Look at

1    Government's Exhibit 237, which will go back to the

2    grand jury room with you.  Look at the back of Michael

3    Mencher's jacket.  He doesn't have the wolf yet.  He's still

4    trying to gain entrance into the 69'ers.

5           If you listen to Government's Exhibit 501 and 502,

6    those calls in November of 2017 between Mr. Mencher and

7    Mr. Leonard, listen to what Mr. Mencher says about the fight

8    in South Beach with Mr. Cosimano and the Outlaws.  It is

9    clear that Mr. Mencher has adopted the beef between the

10   Outlaws as his own.

11          Mr. Mencher doesn't know anything about

12   Paul Anderson, but at a moment's notice he's willing to arm

13   himself, get on his motorcycle and kill him if necessary,

14   all in the name of the 69'ers.

15          Counts Three and Seven charge discharge of a

16   firearm in relation to a crime of violence.  Count Four

17   charges discharge of a firearm in relation to a crime of

18   violence causing death.  The crime of violence underlying

19   Counts Three and Four is the murder of Paul Anderson, and

20   the crime of violence underlying Count Seven is the shooting

21   of James Costa, and we've already discussed these crimes.

22   Counts Three, Four and Seven simply charge that a firearm

23   was used and discharged during the course of these crimes.

24          You heard testimony from Dr. Hermans, who removed

25   the projectile from James Costa's body.  That projectile is

1  in evidence if you want to look at it.  It's Government's

2  Exhibit 109.

3        Additionally, you heard testimony from Dr. Palma,

4  who testified that six bullets ripped through

5  Paul Anderson's body, breaking his bones, piercing his

6  lungs, liver and heart, and ultimately one bullet lodging in

7  his head, causing his death.

8        Mr. Anderson's autopsy photos can be found at

9  Government's Exhibit 225 if you care to review them, and in

10  evidence at Government's Exhibit 208 is the firearm used to

11  kill him.  I would submit to you that there is no doubt that

12  a firearm was used during both of these crimes.

13        Ladies and gentlemen, the last count for your

14  consideration is Count Nine, and that's a drug conspiracy,

15  the heroin conspiracy.

16        I expect that the Judge will instruct you that a

17  heroin conspiracy requires three elements to be met.  First,

18  two or more people in some way agreed to accomplish a shared

19  and unlawful plan to possess heroin; second, the defendant

20  knew of the unlawful purpose of the plan and willfully

21  joined in it; and third, that the object of the unlawful

22  plan was to possess with the intent to distribute heroin.

23        Now, ladies and gentlemen, in this case the

24  evidence has established beyond a reasonable doubt that drug

25  use and sale in the 69'ers was rampant.  Arthur Siurano

1   supplied Erick Robinson and Erick Robinson supplied

2   Michael Mencher.

3           Sean Leonard told you that during a random car

4   ride to Walmart that Mr. Mencher openly admitted that he was

5   supplied heroin by Mr. Robinson and that he distributed

6   small amounts of it.  Mr. Guinto also testified that on the

7   very day of Paul Anderson's murder, that Mr. Mencher was

8   planning to make a delivery of heroin.  Even in this regard,

9   ladies and gentlemen, the evidence establishes beyond a

10  reasonable doubt that the defendant, Michael Mencher, was a

11  member of a heroin conspiracy.

12          During opening statements, Mr. Wise said that the

13  defendants were just a bunch of wannabes, and he was right.

14  Mr. Mencher and Mr. Cosimano wanted to be feared, they

15  wanted to be respected, and they would not let anything or

16  anyone stand in their way, not rush hour traffic, not

17  toll plaza cameras, and certainly not any Outlaw, including

18  Paul Anderson.

19          On December 21st, 2017, unbeknownst to him, there

20  was a pack of wolves chasing their prey.  At the

21  intersection of Suncoast Parkway and State Road 54,

22  Christopher Cosimano and Michael Mencher raced to the front

23  of the pack and they executed Paul Anderson.  But like they

24  say, when you hunt with the pack, you join in the kill.

25  Cody Wesling and Allan Guinto hunted with the pack and they

1  have pled guilty to murder.  Now it's time to hold the

2  leaders of the pack responsible for this crime.

3           Ladies and gentlemen, I'm asking you to return a

4  verdict that's supported by the evidence in this case.  I'm

5  asking you to return the only just verdict, and that's a

6  verdict of guilty on all counts.

7           Thank you.

8           THE COURT:  Counsel.

9           MR. WISE:  May it please the Court.

10          THE COURT:  Yes, sir.

11          MR. WISE:  Counsel.

12          Ladies and gentlemen, Chris Cosimano is not the

13  person who shot James Costa and he's not the person who shot

14  Paul Anderson.  I think and I hope that the evidence over

15  these last two weeks has shown you that.  I'm sure that you

16  all have realized at this point that essentially all the

17  charges alleged against Mr. Cosimano relate back to those

18  two allegations, the shooting of James Costa and the

19  shooting of Paul Anderson.

20          Before I get back to those two specific

21  allegations, I want to talk about something else that's

22  really critical here and that is the allegation that there

23  was an -- there was an enterprise and that this enterprise

24  engaged in interstate commerce or that its activities

25  affected interstate commerce, because Mr. Gammons eloquently

1    described the charges against Mr. Cosimano, you know,

2    murder, conspiracy to commit murder, assault, but there's

3    a little more to it, because it is conspiracy to commit

4    murder in aid of racketeering, it's murder in aid of

5    racketeering, and it's aggravated assault in aid of

6    racketeering, because that element is what vests the

7    jurisdiction of this Court and has us here today.  That

8    cannot be lost on you.

9            Now, the indictment charges that the enterprise

10   functioned as a continuing unit for a common purpose of

11   achieving the objectives of the enterprise, and then the

12   jury instructions -- and as you've -- you already realize,

13   the Government has to prove that the enterprise was also

14   engaged in interstate commerce or its activities affected

15   interstate commerce.  It at least has to have a minimal

16   effect.

17           Now, you've heard a lot about this alleged

18   enterprise, and let me highlight a couple of things about

19   it.  It is started, I believe, late 2016 at some point, and

20   it's started by Sean Leonard, and they have three members

21   when it starts.  Three members.  At its height, according to

22   Leonard, they had six or seven.  I find it kind of

23   interesting that Leonard can't even give us an exact number

24   on that, but in any event he says at its height six or seven

25   members.  That's the enterprise.

1          The clubhouse, which -- or the purported

2    clubhouse, if -- we couldn't call it a clubhouse, I guess,

3    but this clubhouse, which is really Mr. Cosimano's garage,

4    doesn't even exist until November of 2017.  And as you

5    heard, Sean Leonard is the first one who comes up with the

6    idea of starting this clubhouse, and he does it when he's

7    acting as an informant and he's trying to save himself from

8    these charges in New York.  And, boy, he does a pretty good

9    job of saving himself from those charges, because now he's

10   only looking at a five year sentence at worst.

11          But in any event, what else have you heard?

12          You've heard about this Constitution and these

13   bylaws.  You've seen those several times.  You've heard

14   a lot from Mr. Siurano about that.  Well, I suggest to you,

15   ladies and gentlemen, that it would be easier to make a list

16   of the bylaws that weren't being followed by these guys in

17   Tampa than it would to make a list of the laws that were

18   being followed.

19          They're supposed to start an LLC.  They're

20   supposed to file taxes.  Well, of course they're not doing

21   that.  Of course these guys aren't doing that.

22          You're not even supposed to start until you have,

23   what, five or six members.  Six members, I think it was.

24   They don't even -- they have half that when this club

25   starts.

1    The clubhouse.  There is no clubhouse until

2    November 2017, and even then, I mean, we are really, really

3    loosely defining clubhouse when we talk about Mr. Cosimano's

4    garage as the clubhouse.

5         What else are we hearing?  Mr. Leonard himself and

6    really I think Mr. Siurano too say Florida does its own

7    thing.  Mr. Leonard said there are no other houses to answer

8    to in Florida.

9         The 69'ers have no concern over territory.  That

10   was one of the things that you heard Mr. Leonard tell you

11   attracted him to the 69'ers, is they're not in these

12   territorial disputes that other motorcycle clubs are in.

13        Their members weren't required to travel to these

14   events.  They did their own thing.  People did their own

15   thing in this Killsborough club, which, by the way, Leonard

16   came up with.

17        So is this an enterprise engaged in interstate

18   commerce or that had an even minimal effect on interstate

19   commerce?  I suggest to you, ladies and gentlemen, a couple

20   of kids with a lemonade stand have more of an effect on

21   interstate commerce than this group, because something else

22   that you're going to be instructed on, I expect, is that you

23   must find -- to find these elements, these enterprise

24   elements, you must find that there was some nexus between

25   the enterprise and the racketeering activity being conducted

1    by members or associates of the enterprise.

2            Now, Leonard is apparently dealing in guns,

3    Erick Robinson is dealing in drugs.  Mr. Cosimano works auto

4    glass.  These are things these guys are doing on their own,

5    it is not -- there's no nexus to the enterprise, the alleged

6    enterprise, these guys in Tampa, and what is taking place,

7    the alleged racketeering activity.

8            You were told that the definition of racketeering

9    is the commission of certain crimes, including narcotics.

10   Well, Erick apparently, it would appear, is involved in

11   narcotics trafficking, but is it -- is it through the

12   enterprise?  Is it racketeering activity that the enterprise

13   is carrying out?  No.

14           The only allegation you ever heard about

15   Mr. Cosimano and drugs, I believe, was this allegation from

16   Cody Wesling, who -- we will discuss him in a lot more

17   detail in a bit, but I would suggest to you trying to pin

18   down what Cody Wesling has to say about anything is like

19   trying to nail jello to a tree.  I mean, he has lied over

20   and over again, which he admits, and I suggest to you

21   you don't know when Cody Wesling is telling the truth

22   because he's -- his story has changed so many times, and he

23   admits that it's changed and he admits that he's lied.  How

24   do we ever know what he's saying?  I don't even know if he

25   knows what he's saying half the time.

1          But in any event, the only allegation of drugs

2   I believe that you heard belonging to Mr. Cosimano is this

3   claim that he has Cody go take some marijuana to a guy he

4   works with in the auto glass business.  I suggest to you

5   you can't believe what Cody Wesling said, but even if you

6   believe that, is that racketeering activity that is being

7   conducted by this enterprise that has a sufficient nexus to

8   this enterprise and that is affecting interstate commerce?

9          I think, ladies and gentlemen, that the hope was

10  by the Government that this evidence was going to paint a

11  picture of this organized criminal enterprise, like a

12  Colombian cartel or something.  The realty is it was a

13  loose-knit group of, yes, wannabes who were doing their own

14  thing and it's as simple as that, and to suggest that that

15  was an enterprise engaged in racketeering activity that

16  affected interstate commerce I think is giving it far, far,

17  far too much credit.

18         Moving to the specific allegations alleged against

19  Mr. Cosimano, what are some things that you all have learned

20  about Mr. Cosimano?  He is known not to carry a gun.

21  Leonard said that.  I think every one of these cooperating

22  witnesses that you heard from were consistent in that, that

23  that wasn't his MO.

24         What else are you hearing?  Well, the one thing

25  you're hearing is Wesling, Leonard and Guinto were known to

```
 1   carry guns and they did carry guns, and I think all three of
 2   them admitted it.  I don't know if Leonard did, but I know
 3   Wesling and Guinto did.
 4           What else?  From the time Mr. Cosimano becomes
 5   President until sometime after Leonard has become an
 6   informant and is stirring up activities, Mr. Cosimano is not
 7   involved in any of these fights.  You heard a lot on the
 8   stand yesterday about fights that he had gotten in, and
 9   I suggest to you most of those fights were taking place long
10   before he was a purported 69'er.  But what's consistent
11   about all those?  He's not -- he's not using a gun.  He's
12   trying to avoid trouble.
13           I think, you know, some of the things you heard
14   yesterday may have -- you may have -- wow, he's gotten in
15   all those fights, but think about it.  Think about all the
16   things you've heard.  This is a guy who is doing everything
17   he can to avoid trouble.  If somebody starts something with
18   him, he doesn't back down, he fights, he fights with his
19   hands, or a plate apparently in Miami, but he's not pulling
20   guns and he's not going out trying to start trouble.  That's
21   something consistent you have heard about Mr. Cosimano's
22   history.
23           Even Leonard admits that, because Leonard tells
24   you -- he admits that, yeah, the night before the LBC, Chris
25   told me not to do that.  He told me I'm going to cause
```

1    trouble, I should not do that.  Leonard is the one who

2    doesn't listen to Chris.  Leonard and Guinto are the ones

3    who get severely beaten, because Chris told them that was

4    probably going to happen, and Chris gets mad at them

5    afterwards and says, I told you you shouldn't have done

6    that.  He's trying to avoid issues.  Leonard and Guinto are

7    trying to create them.

8            And what's the importance of this?  What motive

9    does Chris Cosimano have to go after these Outlaws?  Are we

10   to believe that he spent all this time trying to avoid

11   trouble, he's never involved in guns, and then all of a

12   sudden apparently, according to Guinto and Leonard, he

13   becomes dead set on killing Outlaws?  It just doesn't make

14   sense.

15           Turning more specifically to the allegation that

16   Mr. Costa -- or, I'm sorry, that Mr. Cosimano supposedly

17   shot Mr. Costa, what is -- what is really the source of

18   that, that evidence?  It's Allan Guinto.

19           One of the things that Judge Scriven is going to

20   instruct you on, I believe, is a specific instruction

21   involving testimony of accomplice or co-defendants with a

22   plea agreement, and it's going to tell you that you should

23   consider the testimony of some witnesses with more caution

24   than the testimony of others, and that is specifically the

25   testimony of an accomplice or a co-defendant with a

1    plea agreement.  The instruction specifically says a witness

2    who hopes to gain more favorable treatment may have a reason

3    to make a false statement in order to strike a good bargain

4    with the Government, and Guinto -- really Guinto, Wesling,

5    Siurano and Leonard are all prime examples of that.

6           Guinto, again -- what's really critical about what

7    Guinto is claiming and what we know about the Costa

8    shooting, Guinto is the one who is in possession of the gun

9    that is believed to have shot Mr. Costa.  He's the one who

10   takes it to Leonard.  Now, he's concocted this story that

11   Mr. Cosimano gave him the gun, but he's also added these

12   other details that I suggest to you make no sense, and I'll

13   elaborate on that in a minute, but he comes up with this

14   other story that says Mr. Cosimano told me this is how it

15   went down.

16          Well, he's saying that, number one, he's kept this

17   gun for leverage over Chris this whole time, which in his

18   explanation, when I asked him about what is his leverage,

19   it's that, well, Chris supposedly thinks that Sean is an

20   informant, all right?  And apparently he was an informant,

21   but where is the evidence?  Who else has ever said that,

22   that they had -- they all had these beliefs that Mr. -- that

23   Sean Leonard was an informant?  Because remember what Cody

24   Wesling claims, and I suggest to you this wasn't true

25   either, but, you know, Cody Wesling, when he's talking about

1  Paul Anderson, says -- which he has never said before in his

2  prior statements to law enforcement, but he says apparently

3  as of July of this year that Mr. Cosimano comes and talks to

4  me after the Paul Anderson shooting and he tells me that he

5  did it for Leonard, because, you know, the Outlaws are after

6  Leonard, so I wanted to protect Leonard.

7        Well, how do we reconcile that?  Because Wesling

8  is claiming that Chris tells him he did it for Leonard, the

9  Anderson shooting; Guinto is saying that Chris thinks

10  Leonard is an informant and that he wants to keep this gun

11  for leverage over Chris.  It doesn't make any sense.

12        And again, he -- he keeps the gun, according to

13  Guinto, but not the clothes that Chris supposedly gives him.

14  Wouldn't you think -- if what Guinto is telling you is true,

15  wouldn't you think he would keep the gun and the clothes?

16  That's kind of a -- there's a nexus there.  But he doesn't.

17        What else has Guinto said?  He said that, well,

18  Chris rammed Costa -- he rammed Costa's bike before he

19  shoots him.  There is no evidence whatsoever that that

20  happened, because you've seen numerous pictures of the back

21  of Mr. Costa's bike and you've seen pictures of the van that

22  Mr. Cosimano drove.  There is not a lick of damage to the

23  back of that bike, and I urge you to take a look at those

24  pictures again.  There is no damage to the back of

25  Mr. Costa's bike.  Mr. Cosimano's van, it's not a -- it's

1    not a minivan, it's a big work van, and if that van rammed

2    the back of that motorcycle, which sits pretty low, you'd

3    see some damage.

4           What else do we know about that?  Mr. Costa

5    himself said that when he saw that van, and he was -- and he

6    sees -- he sees that van, a little later on, or really

7    I think maybe at the same time, he's feeling some difficulty

8    with his bike, causing him to lay it down, but he says,

9    I wasn't worried about that van because it was so far back.

10   I knew that if my bike went out on me, I wouldn't get run

11   over because the van was far enough back to stop.  There's

12   no way Mr. Cosimano's van is ramming into the back of

13   Mr. Costa's motorcycle.

14          If there is some ramming taking place, what --

15   what could it -- what could it have been?  A black

16   Dodge Charger.  It sits low, it is essentially on the same

17   plane as that bike, and which -- if you're on a rural road,

18   which this took place on, with no lighting, and that -- that

19   car turns its lights off, it could -- it could ram the bike.

20   That might explain why Mr. Costa's bike did seem to -- now,

21   he never -- I don't believe he ever testified that anyone

22   ever rammed it, so I don't know if that happened, but it

23   might explain, because it is pretty coincidental that he

24   started to feel problems with his bike and his bike goes

25   down.  But does it make any sense, if that's caused by

1  ramming from another vehicle, that it's a big white van, or

2  does it make more sense that it's a low black car?

3          Now, what else do we know about Allan Guinto?

4  Well, he's never investigated as having been involved with

5  the Costa shooting, despite the fact that he turns over the

6  gun to Leonard, despite the fact that Mr. Costa has

7  contacted the detective shortly after he's shot and says,

8  you know what, I forgot, there was a black car that I saw

9  right around the time I got shot.  The detective when I

10  asked him about that says, well, I didn't have any knowledge

11  of any black car.  Well, he did.  He did, because

12  Allan Guinto drove a black car, and Allan Guinto is the one

13  turning over the gun.

14          But apparently -- and I -- you know, I --

15  law enforcement is a difficult job and I'm not faulting the

16  detective.  I think he had his sights set, he thought it was

17  Mr. Cosimano, he's wearing blinders, he doesn't put two and

18  two together and realize, wait a minute, we got a black car,

19  we have -- Guinto drives a black car, but the reality is he

20  doesn't conduct any investigation into Guinto, doesn't pull

21  Guinto's phone records, toll records, doesn't take Guinto's

22  car into custody.  They take Mr. Cosimano's van into

23  custody, they don't find a lick of evidence connecting him

24  to the shooting and they give it back to him.

25          What's the one -- I guess the last piece of

1   evidence concerning the Costa shooting is this claim from

2   Art Siurano up north when they're at the 50th anniversary

3   party.  And of course this is something that Siurano doesn't

4   say until, you know, he's popped and he's in custody and

5   he's trying to strike a deal himself, but he claims -- and

6   you've heard about how -- I think Siurano himself admitted

7   he was a cocaine user back at the time.  You've heard these

8   other guys testify that when they -- when they had a party,

9   Siurano, he got loaded.

10          But supposedly at this party, the 50th anniversary

11   party, which is a huge party and they make patches for it,

12   I suggest to you you have to believe that Siurano was pretty

13   intoxicated, but he's claiming, well, Chris says he shot

14   Costa, doesn't give any details, but he just says that,

15   yeah, that was me, and that's that.  And Siurano never says

16   anything about that until he's trying to strike a deal.

17          Now, the Paul Anderson shooting.  Once again,

18   ladies and gentlemen, I ask you to ask yourself, what is the

19   motive for Mr. Cosimano to carry out that shooting?

20          One of the charges alleged is that there was a

21   conspiracy to commit the murder of Paul Anderson, and a

22   couple of the elements -- I believe they may have been

23   addressed already, but I want to go back over them --

24   is that you have to find that two or more persons in some

25   way agreed to try to accomplish a shared and unlawful plan

1  and that the defendant, and in particular in this -- as to

2  Mr. Cosimano, Mr. Cosimano knew the unlawful purpose of the

3  plan and willfully joined in it.  There was no evidence of

4  conspiracy in this murder.

5        One thing that everyone you heard from seemed to

6  be consistent on was that everyone was surprised when

7  Paul Anderson gets shot.  Even in Mr. Mencher's call with

8  Leonard they talk about how there was no plan.  I mean,

9  they're laughing about it.  And Leonard is even saying --

10 and I'm going to discuss more about Mr. Mencher's call in a

11 bit, but Leonard is even saying, you know, that's weird.

12 Weird.  It's weird about that.  It makes absolutely no sense

13 that there was a conspiracy ahead of time, and if there was,

14 it was probably the worst planned out conspiracy in the

15 history of crime.

16       Wesling is telling you there's talk of going to

17 beat the expletive out -- I think he says he doesn't even

18 know it's Paul Anderson, but to go beat -- the beat the S

19 out of an Outlaw.  There may have been.  There may have been

20 a conspiracy to go and batter an Outlaw, I don't know, I'd

21 suggest to you even that was shaky, but there's no

22 conspiracy to murder.

23       Everyone -- now, there -- well, there were a lot

24 of inconsistencies between what Wesling said and what Guinto

25 said, and a lot of those inconsistencies I suggest come with

1    what happened beforehand, but we do know that it's not out

2    of the ordinary, in fact it is the ordinary, especially in

3    December, for Mr. Mencher and Mr. Cosimano to have their

4    faces covered when they're riding.

5              Of course, I mean, think about it, it's December,

6    you're on an interstate, so you have 70 plus mile an hour

7    wind coming at your face.  I mean, you know, I'm sure there

8    are some people who can go out there without anything on

9    their face, but I think most people are going to want some

10   kind of cover, so that's not unusual.

11             You know, there's inconsistencies about whether

12   Mr. Cosimano supposedly took these stickers off his bike.

13   I think Wesling said that he didn't see that.  But in any

14   event, flipping the plate, that's something that was normal,

15   flipping the license plate, it's something that Mr. Cosimano

16   had devised to, you know, get around toll booths.

17             So both these guys, Wesling and Guinto, are

18   consistent in saying that, you know, there was nothing out

19   of the ordinary taking place before they left the house.

20   The inconsistencies from there, I suggest, become even

21   greater between not only what Guinto and Wesling claim

22   happened but between what Guinto and Wesling have said over

23   time as to what happened.  I hope that you were able to see

24   when they testified how much their stories have changed, how

25   much they have left out in the past, how much they have said

1    something inconsistent in the past, and you will see in the

2    instructions that that's something that you can and should

3    consider when you're evaluating the credibility of these

4    witnesses.  Both these guys' stories have changed

5    repeatedly, repeatedly over time.

6            But in any event, at the time -- at the time of

7    the shooting -- we've heard from essentially four people who

8    were in the general vicinity when the shooting takes place,

9    Guinto, Wesling, Reggie Robinson and Ms. Kelcie.  I believe

10   it was Amber Kelcie.

11           Guinto is claiming he's at the toll when the

12   shooting goes down, and he admits he can't see it, and

13   I suggest to you he has no idea what's going on because

14   consider -- Guinto claims to you -- and I really tried to

15   question him to make sure this is what he was saying, but

16   he's saying they go left after the shooting, they go back

17   towards New Port Richey, back towards the water.  We know

18   that -- I mean, everyone says they go the other way, and you

19   have the video in the neighborhoods.  Nobody went left.

20   Guinto didn't know what was going on, and I would suggest to

21   you he didn't see what was going on.

22           Wesling, on the other hand, he claimed to have

23   been right behind Paul's truck, but we know that he wasn't

24   because Reggie Robinson was right behind Anderson's truck.

25           Now, Guinto -- or, I'm sorry, Wesling, his -- his

1  allegations about what happened have changed repeatedly, and

2  I suggest to you he's added and added things as time has

3  gone on, but one thing that I -- that I believe did happen

4  is that Mr. Cosimano is standing when the shooting takes

5  place.  That's something that Wesling says he saw and

6  I think he might have seen that, but as I'm going to explain

7  in a moment when we compare how -- what we know about the

8  measurements and the trajectory of the shots, there's no way

9  Mr. Cosimano, if he's standing, is shooting.  I think

10 Wesling and Robinson did see him standing, and that's -- and

11 he was standing, I would suggest to you, but that means he

12 couldn't have been shooting.

13         But in any event, Robinson, Mr. Robinson, he said

14 something similar to Wesling, but one of the another --

15 you know, another little tidbit of the instructions that

16 you're going to be given is that you can consider that

17 people naturally tend to forget some things or remember them

18 inaccurately.  Mr. Robinson, I don't think -- I don't

19 suggest he's coming here trying to deceive you in any way,

20 but I want you to consider how much time has passed and how

21 much he has been exposed to news media since the day of the

22 shooting, because the day of the shooting he's asked about

23 the statement that he wrote out handwritten himself and he

24 didn't say anything about seeing who shot or even seeing the

25 shots fired.  He says he heard them.  That was in his own

1    handwritten statement.  If he saw who shot or even if he saw

2    the shots being fired, don't you think he would have

3    included that most important detail in his own handwritten

4    statement?  But it wasn't there.

5          You have heard from several other witnesses about

6    all the media coverage that took place after this happened,

7    and you've got to assume Reggie Robinson, who was right

8    there where it took place, he's got to be following the

9    media.  He's talking.  You know, over time, in his mind, has

10   it come -- and maybe he's heard what Wesling has had to say.

11   In his mind has it changed to "I did see the shooting"?

12   Maybe.  But what we know is that day, when he wrote his own

13   handwritten statement, he didn't say he saw the shooting, he

14   said he heard it, and he didn't say which of the two bikes

15   was shooting.

16         The photograph that he took I think is critical,

17   and Mr. Gammons showed it to you, and I ask you to take a

18   look at it when you're back there deliberating, because it's

19   my recollection -- I think Mr. Robinson took that from his

20   driver's seat, behind Paul Anderson's truck.

21         If you look closely at that and you consider where

22   he says the bikes were, you would -- you can see that if --

23   if the guy who has the helmet on, which we know is

24   Mr. Cosimano, if that guy is standing, he would be able to

25   see that, but what he can't see from that vantage point when

1   you look at that photo is the lower portion of the passenger

2   side window where the shots -- where we know they went in,

3   were really -- I mean, take a look at it yourselves, but

4   I think even a couple feet out of that you can't see, so

5   there is no way, him sitting there, he could have seen -- if

6   Mr. Cosimano was standing there with a gun pointed at the

7   window, he couldn't have seen that.  He could have seen

8   Mr. Cosimano standing.  He could not have seen a gun

9   stretched out to that portion of the window.

10          Finally, Ms. Kelcie, she testified, and again,

11  she -- I think, you know, she is a prime example of someone

12  who over time, you know, doesn't remember as well as they

13  did at the time, but she -- you know, she didn't recall

14  until she was shown a portion of her statement that, yeah,

15  I did see -- I saw that other bike go first, the one that

16  didn't have -- the guy -- the driver was not wearing his

17  helmet, not Mr. Cosimano's bike, she sees Mr. Mencher's bike

18  go first, hears the shots, and it's after she sees Mencher's

19  bike go by that she sees the bike being driven by the guy

20  with the helmet.

21          Well, aside from that evidence, what evidence can

22  we say for certain is accurate?  It's the measurements of

23  where those bullets entered and exited the cab of

24  Mr. Anderson's truck and it's the trajectory that those

25  bullets were on.  The crime scene technician testified that

the bullet hole -- the entrance hole on the passenger side
is at the height of four feet seven inches off the ground.
Mr. Cosimano is about 6'1", he's wearing boots, and he's
firing a .45, a large caliber pistol.  If he is pointing
it -- and keep in mind too, Paul Anderson is sitting, and
that truck of his doesn't sit very high.  He's sitting there
when he's shot, we know that for a fact.  Think about how on
earth could a guy who is 6'1" stand right in front of a
truck, point a .45 down at a guy who is sitting below him at
the height of four feet seven inches?  It doesn't make
sense, and if it did happen, the bullets would have had to
have -- the gun either would have had to have been basically
literally shooting from the hip, which we know that there's
no accuracy, and we know that there's some pretty good
accuracy here, or the bullets would have had to have entered
higher and gone on a downward trajectory, but they didn't.
The medical examiner himself said he has two of the -- two
of the bullets -- six bullets hit Mr. Anderson, so, I mean,
this is not shooting from the hip, these are well-placed
shots, two of them are on a flat trajectory, two are
slightly upward, two are slightly downward, and the crime
scene technician says the exit -- whatever bullets exited
the vehicle are exiting at the height of four foot five,
just two inches lower than the height where they entered.
This is a flat trajectory.

1    So these are details that may not seem that

2    important until you start to think about what is being

3    described, and we have two people claiming that Mr. Cosimano

4    was standing.  If he's standing, how -- how do you explain

5    the height and trajectory of the shots?  It just doesn't

6    make sense.

7    What does make sense, ladies and gentlemen, is

8    that it was not Mr. Cosimano who did the shooting, that he

9    was there and that, as I told you in opening, it was a rogue

10   act that he did not know was going to take place, and I

11   suggest to you that's consistent with Mr. Cosimano's

12   history.  And I don't want to hammer Mr. Mencher, but

13   Mr. Mencher is the one who is trying to earn his way into

14   the group, he's the one who is using heroin at this time,

15   and he's the one who is going to fly off the handle and do

16   something stupid like shoot Paul Anderson.

17   I suggest to you, ladies and gentlemen, when you

18   look at -- compare the physical evidence with the witness

19   testimony, I suggest to you that's what happened, and

20   that's -- that's the only thing that make sense here.

21   Now, I'm sure Mr. Gammons is going to say, well,

22   how about what Mr. Mencher had to say in those calls with

23   Leonard?  Well, at that point obviously the photographs of

24   those bikes are plastered everywhere in the media.

25   I suggest to you Mr. Mencher has to have known at that point

1  he's in deep water, and he probably knows that he made a

2  huge mistake, and at that point the only way is to start

3  trying to deflect blame onto Mr. Cosimano.  I don't know.

4  I don't know what is in Mr. Mencher's mind at that point,

5  but I suggest to you, again, consider the physical evidence

6  with the testimony of the people who were -- who were there.

7  That's really the only thing that makes sense in this, in

8  this scenario.

9          Something else.  Guinto claims, you know, after

10 the fact that Mr. Cosimano hands him the gun later and tells

11 him to get rid of it, even though he's confronted with the

12 fact that he's previously said that, no, it was handed to

13 Erick actually.  Does it make sense why Mr. Cosimano --

14 really in this shooting or the Costa shooting, why on Earth

15 would someone who is shooting someone else want to give the

16 evidence to another person?  I mean, does he really trust

17 Guinto enough, if we're to believe Guinto, to do that, to

18 give him the smoking gun, literally?  Does that make any

19 sense?

20          And consider again how much Guinto's story has

21 changed in that regard, and consider again that, you know,

22 I think the -- the -- Aaron Smith, the detective who did the

23 video compilation, he wants you to think that -- well,

24 I don't know, I don't think he's trying to sell you on any

25 crazy stories, but he's saying he thinks Mr. Cosimano hands

1    the gun to Mencher, which doesn't make sense with what

2    Guinto would be claiming.  I'm not suggesting that that's

3    what happened.  I think that there's probably chaos after

4    this shooting takes place and I think that it's in -- when

5    you listen to the calls that Mr. Cosimano is having with

6    Leonard, again, consider -- Mr. Cosimano is not saying he

7    had anything to do with this, but I suggest to you there is

8    concern in his voice that is consistent with, you know, him

9    having realized that things went down the way they weren't

10   supposed to go down.

11          Wesling's claim afterwards that, as I mentioned

12   before, Chris supposedly meets up with him at a gas station,

13   and that's something he's never said in all these times that

14   he's talked to the police, he never says that until, he

15   admits, he's getting ready for trial last month, he's never

16   said that, and his explanation when I asked him why, how is

17   it you never brought this huge detail out before, well,

18   I didn't want -- I didn't want to get in trouble.  I didn't

19   want to -- I feared for myself, even though he's claimed all

20   along Mr. Cosimano supposedly did the shooting.  I suggest

21   to you it makes no sense.  Why would you hold back critical

22   details when you've let the cat out of the bag?

23          Mr. Siurano, as with Mr. Leonard, talks to

24   Mr. Cosimano shortly after this all happens and Mr. Cosimano

25   is not saying he had anything to do with this.

1        I know, ladies and gentlemen, the evidence --

2   there's been a lot of evidence you've heard.  You've been

3   here for two weeks.  I suggest to you that when you consider

4   all that evidence as a whole, and I suggest to you -- I ask

5   that you please take a look at some of these photographs,

6   consider the physical evidence that you've seen.  I suggest

7   to you it makes absolutely no sense that Mr. Cosimano was

8   the person who shot Paul Anderson.  I suggest to you when

9   you consider the conflicts in the evidence, it makes no

10  sense that he was the person who shot Paul Anderson or that

11  he shot James Costa, and I suggest the lack of the evidence

12  similarly shows you that.

13       One thing I want to touch upon before I take my

14  seat again is that you're going to -- you're going to hear a

15  lot of instructions in just a moment, I believe.  One of the

16  instructions is going to be the definition of reasonable

17  doubt.  You are going to be instructed that proof beyond a

18  reasonable doubt is proof so convincing that you would be

19  willing to rely and act on it without hesitation in the most

20  important of your own affairs.  Think about that.  Rely and

21  act on it without hesitation in the most important of your

22  own affairs.  Getting married, buying a house, making

23  decisions about your children; proof beyond a reasonable

24  doubt is proof so convincing that you would make decisions

25  comparable to those without hesitation.

1              Do you have that kind of conviction in this case,

2    that you could act and rely without hesitation in the most

3    important of your own affairs?  I think and I hope, ladies

4    and gentlemen, that the evidence has shown that Mr. Cosimano

5    was not the person who shot James Costa and was not the

6    person who shot Paul Anderson and that he did not conspire

7    to shoot Paul Anderson.

8              In just a moment I'm going to take my seat.

9    I have no doubt -- well, you'll hear from Ms. Borghetti as

10   well, and either Mr. Gammons or Ms. Adams will have the

11   opportunity to give a rebuttal argument.  I have no doubt

12   they will give -- whichever of the two of them it is will

13   give a very brilliant argument.  I cannot get back up and

14   talk to you, rebut what they say, and that's not because

15   I don't want to, it's because those are the laws of

16   evidence.  If we don't have rules making the lawyers shut

17   up, this would probably go on in perpetuity.

18             But in any event, I ask you to consider that

19   physical evidence and consider the conflicts in the evidence

20   and ask yourself, do you have that conviction, are you

21   willing to act without hesitation in the most important of

22   your own affairs if you're to find Mr. Cosimano guilty of

23   any of these charges?  I suggest that the evidence would not

24   support that and I'm going to ask that you render verdicts

25   of not guilty on all the charges, and with that I will take

1  my seat and I give you Mr. Cosimano.  His fate is in your

2  hands.

3          THE COURT:  Thank you.

4          We're going to go ahead and take the morning break

5  for about 15 minutes.  Come back at five after.  Do not

6  begin discussing the case among yourselves.

7                    *(Jury exits proceedings.)*

8          THE COURT:  Court stands in recess for 15 minutes.

9                    - - - - -

10          (Recess at 10:46 a.m. until 11:06 a.m.)

11                    - - - - -

12          THE COURT:  Are counsel ready to proceed?

13          MS. BORGHETTI:  Yes, Your Honor.

14          MR. GAMMONS:  Yes, Your Honor.

15          THE COURT:  Please re-call the jury.

16          Any issue with the instructions?

17          MR. GAMMONS:  No, Your Honor, not from the

18  United States.

19          MR. WISE:  No, Your Honor.

20          MS. BORGHETTI:  No, Your Honor.

21          THE COURT:  And the verdict form?

22          MR. GAMMONS:  No issues, Your Honor.

23          MR. WISE:  No, Your Honor.

24          MS. BORGHETTI:  No, Your Honor.

25          THE COURT:  Thank you.

 1                    *(Jury re-enters proceedings.)*

 2              THE COURT:  Ms. Borghetti.

 3              MS. BORGHETTI:  May it please the Court.

 4              THE COURT:  Yes, ma'am.

 5              MS. BORGHETTI:  Counsel.

 6         Good morning, ladies and gentlemen.

 7              JURORS:  Good morning.

 8              MS. BORGHETTI:  The American jurisprudence system

 9    is different from any other system in the world because of

10    the basic tenets of presumption of innocence, burden of

11    proof, reasonable doubt and you, the jury.

12              A person is arrested and they're brought into

13    court and charged with a crime, and it's the Government's

14    burden to prove the charges against Mr. Mencher beyond and

15    to the exclusion of every reasonable doubt.  Let's talk

16    about that presumption.  That presumption stays with my

17    client unless and until the Government proves beyond a

18    reasonable doubt to you that he has done this, that he has

19    done the essential elements of the crimes that he is charged

20    with.

21              If you think of this trial as a vase and the

22    evidence as water going into the vase, reasonable doubt is

23    cracks in the vase, and right now there's water on the

24    floor.

25              Ladies and gentlemen, you decide what the evidence

1   is.  You decide what the facts are.  You decide whether the

2   Government -- and the Government bears this burden, and this

3   burden is very high, and it is a very heavy burden, and each

4   of you has a vote, and each and every vote counts, and you

5   can look to the Government and say, you have not proved

6   these charges against Mr. Mencher to me beyond a reasonable

7   doubt.

8            Now, Her Honor is going to give you instructions,

9   but I'm going to paraphrase from the reasonable doubt

10  instruction.  A reasonable doubt is a real doubt based on

11  reason and common sense after considering the evidence.  And

12  remember, you get to decide what the evidence is, and proof

13  beyond a reasonable doubt is proof so convincing that you

14  would be willing to rely and act on it without hesitation in

15  the most important of your own affairs.  The most important

16  of your own affairs.

17           Can you right now write that check for $1 million

18  because you know you have it in the bank?  I submit to you

19  you can't.  I submit to you that there is reasonable doubt

20  on all counts against my client.

21           Now, where does this reasonable doubt come from?

22  Reasonable doubt comes from the evidence, it comes from a

23  conflict in the evidence and it comes from lack of evidence.

24           What did we see?  We see a photograph of my client

25  purported to be on New Year's Eve of 2016 going into 2017.

1   Well, the defense brought you a medical record.  We're not

2   saying he wasn't there.  There's a photograph of him there.

3   What we're saying is the witnesses are trying to put it as

4   New Year's Eve and, lo and behold, Mr. Mencher is in the

5   hospital in Margate, Florida, not Orlando.  So look at that,

6   Defense Exhibit 1.

7           I want you to remember that most of these

8   witnesses had a motive and had a bias to testify in which --

9   the way they did.  Now -- so we hear of Mr. Mencher and we

10  see a photograph purported to be around that time of 2017,

11  and then we fast forward and the evidence is that he is

12  there with this group, moved over from Fort Lauderdale, from

13  his girlfriend's house, in end of October, middle of

14  November of 2017, but let's talk about what happens in

15  that timeframe.

16          Within that timeframe that my client is not there

17  we have Mr. Cosimano talking about all the different groups

18  he was in, motorcycle groups, getting punched, getting --

19  you know, getting in fights, in bar fight after bar fight.

20          We see Sean Leonard, he's actually a member of the

21  Outlaws and he leaves that group and supposedly crosses

22  over.  And what do we hear?  Mr. Leonard, we hear he's part

23  of this LBC, Local Brewing Company, right?  You didn't hear

24  about Mr. Mencher there.  At this Local Brewing Company in

25  April of 2017 it's Paul Anderson that comes looking for

1   Sean Leonard, because within that time frame from New Year's

2   to October of 2017 there is a history between Sean Leonard

3   and Paul Anderson, between that timeframe there's a history

4   between Christopher Cosimano and Paul Anderson, and I submit

5   to you there's a history between Sean Leonard and

6   Christopher Cosimano.

7           There is this -- right after this Local Brewing

8   Company where Paul Anderson comes gunning for Sean Leonard,

9   and Mr. Leonard has a firearm, Mr. Guinto has a firearm, and

10  all these Outlaws come in and they come right over to the

11  table and they sit down, and you hear Mr. Leonard say, yeah,

12  I'm a tough guy, I just buttoned up my vest or zipped it up

13  and I took a beating, and he's proud of that beating.  You

14  saw the photographs of his eye.

15          But what else did you hear?  Right after that he's

16  trafficking in arms.  He is moving arms and drugs from

17  Florida to New York and he gets caught.  He gets caught and

18  he turns into a Government rat, a confidential informant,

19  like that.

20          Then we go to -- the next incident we hear about

21  is this Costa shooting.  You did not hear that my client was

22  involved with that Costa shooting.

23          The next we hear of my client is the Quaker Steak.

24  The Quaker Steak incident, my client does not have a gun.

25  My client has a knife.  Mr. Guinto had a gun and Cody

1  Wesling had a gun.

2         Now, at this point the history between Christopher

3  Cosimano and Paul Anderson -- the fires were burning, the

4  envy was burning, the jealous was burning, the hatred was

5  mounting, and Christopher Cosimano put a plan in motion, he

6  was going to kill Paul Anderson.

7         When they went down to Miami, they left my client,

8  who, remember, they call him the Village Idiot, and they

9  call him this behind his back, they went down to Miami and

10 he gets in a fight and he gets beaten up by these Outlaws

11 down there.  You will hear the tape -- you've heard the tape

12 and you can listen to it again, where my client is upset

13 that they left him out of this, "they left me behind."

14        Now, I'd like to move right directly to the

15 incident of December 21st of 2017, but first I would like to

16 remind you that on cross-examination I asked Mr. Guinto

17 wasn't it true that on January 3rd of 2018 -- this is after

18 he's been arrested and he's in jail and he's talking to his

19 girlfriend, his fiancée, and he says to her:  Pumpkin and

20 I -- I think it's Punken, excuse me, and I had nothing to do

21 with this, this is all Chris.

22        Think about this, ladies and gentlemen.  Why does

23 this man align himself with Michael Mencher?  Why doesn't he

24 align himself with Cody Wesling?  Why doesn't he align

25 himself with Christopher Cosimano?  Why doesn't he align

1   himself with Erick Robinson?  It's because my client didn't

2   know of the plan and didn't willfully enter into the plan,

3   and that I submit to you should be in the back of your mind.

4          That man also said on the very same day he called

5   or he messaged his brother and he told his brother, hey, I'm

6   not sure of Punken's name, I think it's Michael Mencher,

7   but -- he supposedly knows my client but he didn't even know

8   his real name.  He said, reach out to him.  I think this

9   guy, Chris Cosimano, is going to be blaming Mencher for the

10  killing.  Remember that.

11         Now, let's go to the actual day.  We've heard the

12  testimony that there was a group meeting or a luncheon and

13  it was Mr. Guinto, Mr. Wesling, Mr. Robinson, and on

14  cross-examination we got out that Mr. Robinson's girlfriend

15  was there, my client was not at that meeting or luncheon,

16  and Erick gets a call from his brother and immediately they

17  got to leave, they got to go, okay?  They go back to the

18  clubhouse.  This is where there's a conflict.

19         Mr. Wesling says they go back to the clubhouse and

20  they're there for thirty-some odd minutes.  I'm not trying

21  to -- you rely on what you remember the evidence is.  What

22  I'm trying to point out to you is that Allan Guinto says

23  that they were there from three to five minutes.  Is that

24  enough time for a plan, for a man who is sleeping?  And you

25  heard the call.  I was sleeping, Chris wakes me up, this,

1  that and the third, let's go, okay?  There's been no
2  evidence that my client knew who Paul Anderson was.  Keep
3  that in the back of your mind.
4          Now, we heard the testimony about the fact that
5  the bikes are pulled out and my client and Mr. Cosimano have
6  their faces covered and their arms covered.  Well, I think
7  Mr. Guinto wanted to say, well, that was -- that was normal
8  for Mr. Cosimano but not for Mr. Mencher, but then on
9  cross-examination he had to admit that, yes, it was normal,
10 there was nothing out of the ordinary for that, right?
11         And then what do you see on that video?  You see
12 my client, and he's behind Christopher Cosimano.
13 Christopher Cosimano put this plan together and he left my
14 client out.  My client followed him, and I don't think that
15 there's any doubt as to who shot and killed Paul Anderson
16 that day.  It was Christopher Cosimano, and he did it on his
17 own.  My client did not shoot Paul Anderson.
18         What do we know?  As I told you in my opening
19 statement, law enforcement didn't know, Sean Phelps didn't
20 know and Cody Wesling, who is right behind, is totally
21 surprised.  Is it reasonable to believe that my client
22 didn't know?  I submit to you it is.
23         After the shooting they go back to the house.
24 Now, we all know that it's all over the news.  Is my client
25 in shock?  Is he flipping out?  You bet.

1          What does he say?  He says:  "We plan more about

2     going to lunch."

3          He just witnessed Christopher Cosimano in broad

4     daylight shoot and kill a man.  Did he try to get rid of his

5     motorcycle?  Sure he did.

6          One of the things they have to prove to you beyond

7     a reasonable doubt is that my client had a gun, and

8     I believe that there's very conflicting evidence that my

9     client had a gun.  The gun that they want to say is my

10    client's -- remember, Michael Mencher rented a room, he was

11    only there for a very short period of time in this room 10.

12    What did the officers say?  They're a little unsure of

13    themselves, but they say the gun is in a closet, and they

14    say that this box of ammunition -- and how convenient, this

15    box of ammunition has my client's name and address on it.

16    Where is the box?  That's lack of evidence.  Where is the

17    picture that shows that that gun was in that closet?  What

18    did they do?  They -- we have a picture of this gun and the

19    bullet on the bed.  They're moving evidence around.

20         What's something I want you to keep in mind?

21    Excuse me.  What do we hear after the fact by Christopher

22    Cosimano?  He doesn't think these people that are coming

23    around in these trucks or making these movements after him

24    are law enforcement, he thinks they're Outlaws.  He's afraid

25    for his brother.  He's talking to Sean Leonard and he says,

1  well, that's okay because, you know what, E has got the gun,

2  E has got the .38.

3          Think about that.

4          What you heard was Erick Robinson and Cody

5  Wesling -- they didn't get arrested until much later.

6  I submit to you that if Michael Mencher is going to do

7  something to get rid of his motorcycle, if he had that gun,

8  he's going to do something to get rid of the gun.  It

9  doesn't make sense.  Erick Robinson had the gun, I submit to

10  you.  Erick Robinson put the gun on the shelf.  He had the

11  time.

12          Now, we've learned probably more about motorcycle

13  groups than we want to in these past two weeks, and I don't

14  know why a person would join such a group.  We've heard

15  brotherhood, family.  I think we heard "family" from

16  Mr. Leonard I don't know how many times, he was concerned

17  with his family, he needed to spend more time with his

18  family, that's why he came to the 69'ers, because they were

19  lax in their rules about mandatory meetings and different

20  things like that.  He wants you to believe he's a family

21  man.  He's a family man that's moving guns.  He's a family

22  man that's melting down guns.  And you heard the list of

23  guns that he was willing to give up, but yet he wants to

24  say, oh, no, that wasn't me, that was my co-defendant that

25  had all those guns.

1          The Judge is going to read you an instruction

2     about witnesses and how to evaluate the testimony of these

3     witnesses, because it is for you to decide whether that

4     witness was telling the truth or not, and it is for you to

5     decide what part, whole or otherwise to believe, because you

6     are the judges of the facts.

7          Now, we've heard Exhibit 509, and this -- I think

8     it appears from the evidence that these -- this group of

9     people that want to be involved with these motorcycle clubs,

10    they're trying to be the biggest man.  Who can take the

11    biggest beating?  Who can give the biggest beating?  This is

12    some sort of badge of honor.

13         Michael Mencher is trying to fit in.  I ask you to

14    listen to 509, and you will hear my client say:  There is no

15    reason for this whatsoever.  This is not F'ing happening

16    right now.  This is totally uncalled for.

17         Remember, the Village Idiot, they didn't let him

18    in on stuff, they kept him out.  Why?  Because Chris

19    Cosimano wanted him as the fall guy.

20         Now, let's talk about Count One, the conspiracy to

21    commit murder.  I submit to you that Mencher did not share

22    in the plan, he did not know about the plan and he did not

23    willfully join the plan.

24         Her Honor will read you the instructions, and one

25    of the instructions she will read you is basically saying

1    it's simply not enough to hold a man criminally responsible

2    in a court of law for just being present or just

3    associating.   A person has to know the unlawful purpose of

4    the plan and willfully join in it.   Simply being present at

5    the scene of an event or merely associating with certain

6    people and discussing common goals and interests doesn't

7    establish proof of a conspiracy.   A person who doesn't know

8    about a conspiracy but acts -- happens to act in a way that

9    advances some purpose of one doesn't automatically become a

10    conspirator.

11            There's not enough evidence to convict my client

12    beyond a reasonable doubt as to the conspiracy to commit

13    murder in Count One of the indictment.

14            Now, Count Two is the murder in aid of

15    racketeering activity.   Mr. Mencher did not pull that

16    trigger, and Mr. Mencher did not assist or aid and abet

17    Christopher Cosimano in doing so.   To be guilty of aiding

18    and abetting -- the Court is going to read you an

19    instruction, and that instruction, which they can't get

20    around, says it has -- that person has to act intentionally.

21    A defendant aids and abets a person if the defendant

22    intentionally joins with the person to commit the crime.

23    The person has to willfully direct.   Knowledge.   Willful.

24    Also, it can't just be there at the time.   I urge you to

25    listen to that instruction, that simple aiding and abetting

```
 1 │ instruction.  Is it reasonable to believe that Mr. Mencher
 2 │ didn't participate?  I think it is, but you decide.  You
 3 │ make the ultimate decision.
 4 │         Now, Count Three is the using or carrying a
 5 │ firearm during and in relation to a crime of violence in
 6 │ connection with Paul Anderson's death.  Mr. Mencher didn't
 7 │ pull that trigger.  There's been no evidence that my client
 8 │ knew that Cosimano had a gun prior to the shooting or that
 9 │ he aided and abetted.  I submit to you that there is no
10 │ credible evidence.
11 │         And remember the aiding and abetting requires
12 │ active participation.  Now, particularly to the next charge
13 │ it requires actual participation, it's a -- it's a different
14 │ aiding and abetting instruction.  So the first aiding and
15 │ abetting instruction I talk to goes to the conspiracy, the
16 │ second aiding and abetting instruction goes to using or
17 │ carrying a firearm, Counts Three and Four.
18 │         A defendant who aids and abets the crime of using
19 │ or carrying a firearm during and in relation to a violent
20 │ crime can be found guilty even if the defendant did not
21 │ personally use or carry the firearm, but to be found guilty
22 │ on this basis, the defendant must have actively participated
23 │ in the violent crime with advance knowledge that another
24 │ participant would use or carry a firearm during and in
25 │ relation to the crime.
```

1          Have they proved to you this advance knowledge on

2     the part of Michael Mencher?  I submit to you that they have

3     not.  And remember, the Government bears this burden and

4     this burden is very heavy and this burden never shifts to

5     the defense.  You said you understood that in voir dire.

6     Her Honor is going to read to you instructions, and we're

7     asking you to follow the law.

8          Now, this instruction goes on to say that -- the

9     end of it says:  The defendant did not choose to continue to

10    participate if he -- if there's prior knowledge of this gun

11    and he chooses -- the defendant did not choose to continue

12    to participate if the defendant learned of the firearm too

13    late for the defendant to be reasonably able to walk away.

14          I submit to you that it's perfectly reasonable, if

15    law enforcement didn't know about the killing of

16    Paul Anderson -- because we know that law enforcement was

17    involved.  We know that law enforcement started working with

18    Sean Leonard.  Sean Leonard didn't know and law enforcement

19    didn't know.  And you heard Mr. Leonard, he said he's on the

20    phone with -- I believe he said it was a gang detective from

21    Pasco County, and he hears the man getting word of this

22    killing.  He's surprised and so is Sean Leonard.  Is it

23    reasonable to believe that my client didn't know?  Yes, it

24    is.

25          Lastly, Count Nine, this conspiracy to possess

1   with intent to distribute heroin.  As I told you in opening

2   statement, there would be no credible evidence that my

3   client conspired to possess with intent to distribute drugs.

4   He was a drug addict.

5          What is the evidence on this count?  Allan Guinto

6   says:  I was in -- I was with Mencher, I was in a bar one or

7   two times when he said "I'm going to sell drugs."

8          When I crossed him he didn't know what bar.  Maybe

9   he -- maybe he did come up with a name of one bar, but he

10  couldn't tell us the date, he couldn't tell us the time, he

11  didn't see any drugs, he didn't see any money, he didn't see

12  any transaction, and when you look over here, you're not

13  going to see any drugs.

14         Then we have Sean Leonard, and Sean Leonard comes

15  in and he says, I was driving with Michael Mencher -- well,

16  excuse me, Mr. Mencher was driving, and we went to Walmart,

17  and Mr. Mencher said to me he sold small quantities of

18  heroin for Erick.  Once again, no time, no date.

19         Who even talks like that?  "I sell small

20  quantities of heroin."  Certainly not a person from

21  New York.

22         I would submit to you, and you have heard it

23  through our cross-examination, that Mr. Leonard and

24  Mr. Guinto have an absolute reason to testify in the manner

25  in which they do.  It is the Government of the United States

1   that holds the card, that 5K, whether you want to call it a

2   letter or a motion, that will get them a reduction in their

3   sentence, and that is what they're trying to do.

4           Mr. Guinto is looking at spending the rest of his

5   life in prison, and Mr. Leonard is looking to go to prison

6   for the first time.

7           What I'd like to say further is on my

8   cross-examination of Mr. Leonard, he -- and, you know, you

9   evaluate these witnesses and you're going to be given a set

10  of instructions as to how you should evaluate these

11  witnesses.  He did not want to admit that he had never,

12  never said before that my client sold small quantities of

13  heroin.  He testified before a grand jury in April of

14  2018 -- excuse me, 2018, of this year -- I mean of last

15  year, to these -- with these prosecutors, and he never said

16  that, and he didn't want to have to admit that.  That,

17  ladies and gentlemen, is reasonable doubt.

18          I submit to you that there is not enough evidence

19  to convict a man in court and to specifically convict my

20  client, Michael Mencher, of possession with intent to

21  distribute heroin, and that, ladies and gentlemen, is

22  Count Nine and I submit to you my client is not guilty.

23          As to that Count Nine and such little evidence,

24  I wish I was as thin as the evidence against Mr. Mencher for

25  Count Nine.

1    On behalf of Mr. Mencher, I'm going to thank you

2 for your time and attention this past two weeks.  Thank you

3 very much.

4    THE COURT:  Counsel.

5    MR. GAMMONS:  Ladies and gentlemen, I just want to

6 touch on a few things that Mr. Wise and Ms. Borghetti just

7 spoke about.

8    The first thing is, as far as I know, Mr. Wise is

9 not an expert in ballistics or trajectory on firearms.  You

10 guys have the evidence and you'll be able to look at the

11 photographs and use your common sense on where the bullet

12 holes are in the side of the car and if someone can put a

13 gun up to the window and shoot where that bullet hole is

14 placed, whether they're sitting or standing.  You'll be able

15 to make that determination for yourself.

16    Mr. Wise spent a few minutes on the enterprise,

17 and I want you to read the instructions -- the Judge will

18 read you the instructions and then you'll get to review them

19 for yourselves -- and you'll see exactly what an enterprise

20 requires.  It doesn't require that you file tax returns.  It

21 doesn't require that you have an LLC.  It doesn't require

22 that you have a clubhouse.  Read the instructions to

23 determine for yourself whether the 69'ers were an

24 enterprise.  I think after reading those instructions you'll

25 figure out that there's hardly -- few more organizations

1  more suited to be an enterprise than the 69'ers.

2         There was also some discussion by Mr. Wise that

3  the 69'ers -- or, excuse me, that there was no racketeering.

4  As I mentioned to you, and as you'll see in the instructions

5  when you read them, racketeering relates to the enterprise,

6  not the defendant.  The enterprise.  So if Art Siurano was

7  engaged in racketeering and it related to the enterprise,

8  the enterprise is involved in racketeering.  If Erick

9  Robinson is engaged in drug trafficking and it's in relation

10 to the enterprise, then the enterprise is engaged in

11 racketeering conduct.

12         I believe Mr. Wise questioned whether the firearm

13 that Mr. Guinto gave to law enforcement was the firearm used

14 in the homicide.  You heard from Major Wells, the guy who

15 talked about candy canes and cartoons.  He told you that the

16 shell casings that you have in evidence, the shell casings

17 recovered at the scene by Maria Macaluso, were from the same

18 firearm that Mr. Guinto gave to law enforcement.  That is a

19 decisive link showing that the firearm he gave to

20 law enforcement was the firearm used to kill Paul Anderson.

21         You've heard a lot about the cooperating

22 defendants, Sean Leonard, Cody Wesling, Allan Guinto, Arthur

23 Siurano.  One thing that you heard they all have in common

24 is that prior to their Federal cases they had never been

25 convicted of a felony.  You heard that all of them are now

1    facing time in prison.  Mr. Siurano, Mr. Guinto and

2    Mr. Wesling are facing life in prison.  You heard that they

3    all hope for a reduced sentence, but none have been promised

4    anything by the United States.  And you'll have their plea

5    agreements or their cooperation agreements in evidence and

6    you can review them during your deliberations, but you know

7    that lying can nullify that agreement.  Lying can take away

8    any possible advantage they get by testifying in this trial.

9    So ask yourself, does it make sense that Mr. Guinto or

10   Mr. Leonard would make up conversations that they had with

11   Mike Mencher that could potentially nullify any benefit that

12   they could get in this case?

13           As you've seen in this case, ladies and gentlemen,

14   the fact of the matter is that everything that they have

15   told you is corroborated by other evidence, and you'll have

16   it all before you and you can compare it during your

17   deliberations.

18           Ms. Borghetti has talked a little bit about the

19   firearm aspect of the charges in relation to Mr. Mencher.

20   It is not true that we have to prove that Mr. Mencher had a

21   gun in this case.  She discussed the aiding and abetting

22   instruction, which means that Mr. Mencher can aid and abet

23   the possession of a firearm with Mr. Cosimano, so read the

24   instructions and know about that, but the evidence shows

25   that Mr. Mencher in fact did have a firearm.

1          Listen to my favorite exhibit, 509, where

2     Mr. Mencher says that he had his on him, referring to a

3     firearm, and that Mr. Cosimano gave his firearm to

4     Mr. Mencher, and he says, "I'm riding around with both these

5     things on me."  That's supported by the firearm that was

6     found in his room, that Kel-Tec, and 35 rounds of

7     ammunition.

8          Last I want to talk about -- I think Mr. Wise and

9     Ms. Borghetti both talked about there being no conspiracy,

10     no plan.  Look at the plea agreements.  Allan Guinto has

11     pled guilty to conspiracy to commit murder in aid of

12     racketeering.  Cody Wesling has agreed to plead guilty to

13     conspiracy to commit murder in aid of racketeering.  There

14     clearly is a conspiracy here, and you can review the

15     evidence for yourself.

16          I want to talk about just with respect to

17     Mr. Cosimano, his state of mind at the time of

18     Paul Anderson's murder.

19          We know that in April of 2017 Mr. Anderson

20     disrespected the 69'ers by beating up Allan Guinto and

21     Sean Leonard.  We know that November of 2017 Mr. Cosimano

22     got jumped by several members of the Outlaws in South Beach,

23     and you can listen to his post-Miranda statement where

24     Mr. Cosimano says that before the fight began somebody named

25     Lynch told him:  "Didn't Paul tell you to stay out of

1  Florida?"  That's Paul Anderson he's talking about.

2          Mr. Wise told you that Mr. Cosimano likes to avoid

3  trouble.  This is the guy who is beating up Outlaws at the

4  flea market, and their girlfriends.  This is the guy who is

5  in South Beach fighting Outlaws.  Review the evidence and

6  see if it's consistent with Mr. Cosimano avoiding trouble.

7          But getting back to my point, Mr. Cosimano told

8  Allan Guinto that he wanted to get two Outlaws, which

9  originally Mr. Guinto thought was cuts.  Later he realized

10  that he wanted to take the lives of two Outlaws.

11          That brings us to December 21st, 2017.

12          When you're asking yourself was there a

13  conspiracy, Mr. Cosimano calls members of his club, who are

14  eating lunch, tells them to come to the clubhouse.  He

15  covers his face.  He covers his license plate.  He doesn't

16  wear his jacket.

17          Mr. Cosimano sends Allan Guinto and Cody Wesling

18  to where Paul Anderson works to watch him.  Mr. Cosimano

19  directs both of them to keep in touch with him about

20  Paul Anderson's whereabouts.  They do.  When Paul Anderson

21  leaves, they notify Mr. Cosimano and they begin following

22  him for several miles.

23          May I have the overhead, Madam Courtroom Deputy?

24          This is Government's Exhibit 202-9.  This is where

25  Mr. Anderson's vehicle came to rest.  Look at where it is.

 1   His foot is on the brake.  He got murdered during rush hour

 2   traffic.  He's several car lengths away from the light.  He

 3   would have been surrounded by vehicles.  He's trapped.

 4   Mr. Cosimano saw that.  Mr. Anderson has nowhere to go.

 5   He's trapped.  At that point he sees his opportunity, he

 6   drives up to the passenger side of Mr. Anderson's truck and

 7   he shoots him several times.

 8        Now I'm going to move on to Mr. Mencher, who both

 9   conspired to commit this crime with Mr. Cosimano and aided

10   and abetted the commission of that crime.

11        What does Mr. Mencher do that day?  Before he

12   leaves the house he arms himself with a gun.  He too covers

13   his face, he covers his license plate, and he doesn't wear

14   his jacket identifying him.  He follows Mr. Anderson for

15   miles.  He is right behind Mr. Cosimano when Mr. Cosimano

16   shoots several times into that vehicle.

17        And again, listen to Government's Exhibit 509.

18   Mr. Mencher said that he was ready to open up into the back

19   of him if Mr. Anderson tried to get away.  In Government's

20   Exhibit 509 Mr. Mencher says it was an assassination.

21   There's no spur of the moment assassinations.  This was a

22   plan by the defendants.  It wasn't a good plan, but this was

23   a plan by the defendants.

24        Ms. Borghetti talked about what American

25   jurisprudence requires and what it doesn't.  It's true that

1   people believed to have committed crimes, they get to come

2   in here, they get to have a trial before their peers, they

3   don't have to present evidence if they want, they have no

4   burden, the Government carries the burden to prove the case

5   beyond a reasonable doubt.  That's totally true.  But in

6   American jurisprudence Mr. Mencher and Mr. Cosimano, they

7   don't get to have their own kind of justice, they don't get

8   to pull up to your truck and murder you because they believe

9   that they've been wronged, that's not their part and that's

10  not American jurisprudence.

11          Ladies and gentlemen, this is the last time that

12  I'll get to speak to you, but at the end of the day, I don't

13  have the last word, you do, and that last word should be

14  guilty.

15          Thank you.

16          THE COURT:  Thank you.

17          Ladies and gentlemen, at this point you have heard

18  all of the evidence, you have heard all of the openings and

19  you have heard the summations of the lawyers.  I have told

20  you that you still can't begin your deliberations until

21  you've heard what the law is that you must follow in

22  reaching the verdict, and in that regard I am now going to

23  read you the jury instructions.

24          I apologize because I assume most of you know how

25  to read, but under our standards the jury instructions have

1   to be read.  I suspect it came about when people couldn't

2   read and so everybody had to be read to.  It is though an

3   enduring tradition, and so we will read them to you.  The

4   other reason is we don't want you to go back to the jury

5   room and just start checking off forms without understanding

6   what the law is that you must apply.

7            So be patient with me.  This is a multi-page

8   document, it's going to take a few minutes.  I'm going to

9   read them to you.  You don't have to take copious notes

10  because you will get sets of them brought back with you to

11  the jury deliberation room to review if you have questions

12  about anything that has been said.  So please be patient as

13  we present the instructions.

14           My courtroom deputy is going to dutifully do the

15  Vanna White routine and turn the pages for me.  We don't

16  have them electronically set up.  So please follow along.

17  And I won't be able to look at you because I have to read

18  these pages.

19           United States of America versus Christopher Brian

20  Cosimano, Michael Dominick Mencher, Case Number

21  8:18-CR-234-T-35SPF.  Court's instructions to the jury.

22           Members of the jury, it's my duty to instruct you

23  on the rules of law that you must use in deciding this case.

24  After I've completed these instructions, you will go to the

25  jury room and begin your discussions, what we call your

1   deliberations.

2   You must decide whether the Government has proved

3   the specific facts necessary to find the defendant guilty

4   beyond a reasonable doubt.  Your decision must be based only

5   on the evidence presented during the trial.  You must not be

6   influenced in any way by either sympathy for or prejudice

7   against the defendant or the Government.

8   You must follow the law as I explain it, even if

9   you do not agree with the law, and you must follow all of

10   the Court's instructions as a whole.  You must not single

11   out or disregard any of the Court's instructions on the law.

12   The second superseding indictment or formal charge

13   against a defendant is not evidence of guilt.  The law

14   presumes every defendant is innocent.  The defendant does

15   not have to prove his innocence or produce any evidence at

16   all.  A defendant does have not to testify, and if the

17   defendants chose not to testify, you can't consider that in

18   any way while making your decision.  The Government must

19   prove guilt beyond a reasonable doubt.  If it fails to do

20   so, you must find the defendants not guilty.

21   The Government's burden of proof is heavy, but it

22   does not have to prove a defendant's guilt beyond all

23   possible doubt.  The Government's proof only has to exclude

24   any reasonable doubt concerning the defendant's guilt.

25   A reasonable doubt is a real doubt based on your

1  reason and common sense after you have carefully and

2  impartially considered all the evidence in the case.  Proof

3  beyond a reasonable doubt is proof so convincing that you

4  would be willing to rely and act on it without hesitation in

5  the most important of your own affairs.  If you are

6  convinced that the defendant has been proven guilty beyond a

7  reasonable doubt, say so.  If you are not so convinced, say

8  so.

9       As I have said before, you must consider only the

10  evidence that the Court has admitted in the case.  Evidence

11  includes the testimony of witnesses and the exhibits

12  admitted, but anything the lawyers say is not evidence and

13  is not binding on you.

14       You should not assume from anything the Court may

15  have said that I have any opinion about any factual issue in

16  this case.  Except for my instructions to you on the law,

17  you should disregard anything I may have said during the

18  trial in arriving at your own decisions about the facts.

19  Your own recollection and interpretation of the evidence is

20  what matters.

21       In considering the evidence you may use reasoning

22  and common sense to make deductions and reach conclusions.

23  You should not be concerned about whether the evidence is

24  direct or circumstantial.  Direct evidence is the testimony

25  of a person who asserts that he or she has actual knowledge

1   of a fact, such as an eyewitness.  Circumstantial evidence

2   is proof of a chain of facts and circumstances that tend to

3   prove or disprove a fact.  There is no legal difference in

4   the weight you may give to either direct or circumstantial

5   evidence.

6           You might want to zoom that in a little bit and

7   then slide it up if you need to so the jury can read it.

8   Thank you.

9           When I say you must consider all the evidence,

10   I do not mean that you must accept all the evidence as true

11   or accurate.  You should decide whether you believe what

12   each witness had to say and how important that testimony

13   was.  In making that decision you may believe or disbelieve

14   any witness, in whole or in part.  The number of witnesses

15   testifying concerning a particular point does not

16   necessarily matter.

17           To decide whether you believe any witness,

18   I suggest you ask yourself a few questions:  Did the witness

19   impress you as one who was telling the truth?  Did the

20   witness have any particular reason not to tell the truth?

21   Did the witness have a personal interest in the outcome of

22   the case?  Did the witness seem to have a good memory?  Did

23   the witness have the opportunity and ability to accurately

24   observe the things he or she testified about?  Did the

25   witness appear to understand the questions clearly and

1 answer them directly?  Did the witness's testimony differ

2 from other testimony or other evidence?

3          You should ask yourself whether there was evidence

4 that a witness testified falsely about an important fact and

5 ask whether there was evidence that at some other time a

6 witness said or did something, or didn't say or do

7 something, that was different from the testimony the witness

8 gave during this trial.

9          To decide whether you believe a witness, you may

10 consider the fact that the witness has been convicted of a

11 felony or a crime involving dishonesty or a false statement,

12 but keep in mind that a simple mistake does not mean a

13 witness was not telling the truth as he or she remembers it.

14 People naturally tend to forget some things or remember them

15 inaccurately, so if a witness misstated something, you must

16 decide whether it was because of an innocent lapse in memory

17 or an intentional deception.  The significance of your

18 decision may depend on whether the misstatement is about an

19 important fact or an unimportant detail.

20          You must consider some witnesses' testimony with

21 more caution than others.  In this case the Government has

22 made a plea agreement with co-defendants in exchange for

23 their testimony.  Such plea bargaining, as it is called,

24 provides for the possibility of a lesser sentence than the

25 co-defendant would normally face.  Plea bargaining is lawful

1    and proper and the rules of this Court expressly provide for

2    it, but a witness who hopes to gain more favorable treatment

3    may have a reason to make a false statement in order to

4    strike a good bargain with the Government.  So while a

5    witness of that kind may be entirely truthful when

6    testifying, you should consider that testimony with more

7    caution than the testimony of other witnesses, and the fact

8    that a person has pleaded guilty to an offense is not

9    evidence of the guilt of any other person.

10          If the Government offers evidence that a defendant

11   made a statement or an admission to someone after being

12   arrested or detained, you must consider that evidence with

13   caution and great care.  You must decide for yourself, one,

14   whether the defendant made the statement; and two, if so,

15   how much weight to give it.  To make these decisions you

16   must consider all the evidence about the statement,

17   including the circumstances under which it was made.  Any

18   such statement is not evidence about any other defendant.

19          The Government must prove beyond a reasonable

20   doubt that the defendant was the person who committed the

21   crime.  If a witness identifies a defendant as the person

22   who committed the crime, you must decide whether the witness

23   is telling the truth, but even if you believe the witness is

24   telling the truth, you must still decide how accurate the

25   information is.

1          I suggest you ask yourself a few questions:

2    Did the witness have an adequate opportunity to observe the

3    person at the time the crime was committed?  How much time

4    did the witness have to observe the person?  How close was

5    the witness?  Did anything affect the witness's ability to

6    see?  Did the witness see, know or see the person at an

7    earlier time?  You may also consider the circumstances of

8    the identifications, such as the way the defendant was

9    presented to the witness for identification and the length

10   of time between the crime and the identification of the

11   defendant.

12         After examining all the evidence, if you have a

13   reasonable doubt that the defendant was the person who

14   committed the crime, you must find the defendant not guilty.

15         When scientific, technical or other specialized

16   knowledge might be helpful, a person who has special

17   training or experience in that field is allowed to state an

18   opinion about the matter, but that does not mean you must

19   accept the witness's opinion.  As with any other witness's

20   testimony, you must decide for yourself whether to rely upon

21   the opinion.

22         We are now getting introduced to the offense

23   instructions.

24         The second superseding indictment charges the

25   defendants with separate crimes called counts.  Each count

1   has a number.  You will be given a copy of the second

2   superseding indictment to refer to during your

3   deliberations.

4          Count One charges unlawful and knowing conspiracy

5   to commit murder in aid of racketeering activity.

6          Count Nine charges knowing, willful and

7   intentional conspiracy to possess with intent to distribute

8   a controlled substance.

9          Counts Two, Three, Four, Six and Seven charge what

10  are called substantive offenses, specifically murder in aid

11  of racketeering, use of a firearm during and in relation to

12  a crime of violence, use of a firearm during and in relation

13  to a crime of violence causing death, and assault with a

14  dangerous weapon in aid of racketeering activity.  I will

15  explain the law governing those substantive offenses in a

16  moment, but first note that the defendants are not charged

17  in counts One or Nine with committing a substantive offense,

18  they are charged with conspiring to commit the specified

19  offenses.  I will give you specific instructions on

20  conspiracy.

21         Each count of the second superseding indictment

22  charges a separate crime against one or more of the

23  defendants.  You must consider each crime and the evidence

24  relating to it separately, and you must consider the case of

25  each defendant separately and individually.  If you find a

1   defendant guilty of one crime, that must not affect your

2   verdict for any other crime or any other defendant.

3          I caution you that each defendant is only on trial

4   for the specific crime charged in the second superseding

5   indictment.  You are here to determine from the evidence in

6   this case whether each defendant is guilty or not guilty of

7   those specific crimes.

8          You must never consider punishment in any way to

9   decide whether a defendant is guilty.  If you find a

10  defendant guilty, the punishment is for the Judge alone to

11  decide later.

12         I want to emphasize that each count of the second

13  superseding indictment charges a separate crime against one

14  or more of the defendants.  You must consider each crime and

15  the evidence relating to it separately, and you must

16  consider the case of each defendant separately and

17  individually.  If you find a defendant guilty of one crime,

18  that must not affect your verdict for any other crime or any

19  other defendant.

20         Additionally, the Government has offered evidence

21  that a defendant made a statement after being arrested.

22  That statement is not evidence about any other defendant.

23         As I have mentioned, the Government must prove the

24  defendant's guilt beyond a reasonable doubt.  A reasonable

25  doubt is a real doubt based on your reason and common sense

after you have carefully and impartially considered all the evidence in the case.  If you cannot resolve conflicts in the evidence necessary to prove the essential elements of a crime against a defendant, you may consider that in your determination of whether there is reasonable doubt as to whether that defendant committed the crime.

You will see that the second superseding indictment charges that a crime was committed on or about a certain date.  The Government does not have to prove that the crime occurred on an exact date.  The Government only has to prove beyond a reasonable doubt that the crime was committed on a date reasonably close to the date alleged.

The word "knowingly" means that an act was done voluntarily and intentionally and not because of mistake or by accident.

The word "willfully" means that the act was committed voluntarily and purposely, with the intent to do something the law forbids, that is, with the bad purpose to disobey or disregard the law.  While a person must have acted with the intent to do something the law forbids before you can find that person acted willfully, the person need not be aware of the specific law or rule that his conduct may be violating.

Where a statute specifies several ways in which an offense may be committed, the second superseding indictment

1  may allege the several ways in the conjunctive, that is by

2  using the word "and."  Therefore, if only one of the

3  alternatives is proved beyond a reasonable doubt, that is

4  sufficient for conviction so long as the jury agrees

5  unanimously as to at least one of the alternatives.

6  　　　　　Anybody want to stand and stretch for a second?

7  We're about halfway through.

8  　　　　　Crimes of violence in aid of racketeering.

9  　　　　　Title 18, United States Code, Section 1959 makes

10  it a crime for anyone to commit, threaten to commit or

11  conspire to commit a crime of violence in aid of an

12  enterprise engaged in racketeering activity.

13  　　　　　For you to find a defendant guilty of a count

14  alleging this crime, you must be convinced that the

15  Government has proved each of the following beyond a

16  reasonable doubt:  First, that the enterprise existed as

17  alleged in the second superseding indictment; second, that

18  the enterprise was engaged in interstate commerce or that

19  its activities affected interstate commerce; third, that the

20  enterprise was engaged in racketeering activity; as to

21  Count One of the second superseding indictment, that the

22  defendant conspired to commit murder; as to Count Two of the

23  second superseding indictment, that the defendant committed

24  murder; as to Count Six of the second superseding

25  indictment, that the defendant committed assault with a

1    dangerous weapon.  I will instruct you shortly on what the

2    Government must prove to establish the defendant committed

3    each crime charged -- I'm sorry, each charged crime of

4    violence.  And, fifth, that the defendant's purpose in

5    committing or conspiring to commit the charged crime of

6    violence was to gain entrance to or to maintain or to

7    increase his position in the enterprise.

8            It is not necessary for the Government to prove

9    that this was the sole purpose of the defendant in

10   committing the charged crime of violence, you need only find

11   that it was a substantial purpose or that the defendant

12   committed the charged crime of violence as an integral

13   aspect of membership in the enterprise.

14           In determining the defendant's purpose in

15   committing the charged crime of violence, you must determine

16   what he had in mind.  Because you cannot look into a

17   person's mind, you have to determine purpose by considering

18   all the fact and circumstances before you.

19           An enterprise includes any partnership,

20   corporation, association or legal entity, and any union or

21   group of individuals associated in fact, although not a

22   legal entity, which is engaged in or the activities of which

23   affect interstate or foreign commerce.

24           Although the enterprise must be separate and apart

25   from the racketeering activity in which the enterprise

allegedly engaged, it is not necessary to find that the
enterprise had some function wholly unrelated to the
racketeering activity.  The enterprise must be proved to
have been an ongoing organization, formal or informal, that
functioned as a continuing unit.

The enterprise is "engaged in interstate commerce"
if it directly engaged in the production, distribution or
acquisition of goods or services in such commerce.  The
enterprise's conduct affected interstate commerce if the
conduct had a demonstrated connection or link with such
commerce.

It is not necessary for the Government to prove
that the defendant knew or intended that the enterprise was
engaged in commerce, or that its conduct would affect
interstate commerce, it is only necessary that the natural
consequences of the enterprise's conduct affected commerce
in some way.  Only a minimal effect on commerce is
necessary.

Racketeering activity means the commission of
certain crimes, including narcotics trafficking, in
violation of 21 U.S.C. 841(a)(1) and 846.  There must be
some nexus between the enterprise and the racketeering
activity being conducted by members and/or associates of the
enterprise.

It is a separate Federal crime for anyone to

conspire or agree with someone else to do something that
would be another Federal crime if it were actually carried
out.  A conspiracy is an agreement by two or more people to
commit an unlawful act.  In other words, it is a kind of
partnership for criminal purposes.  Every member of a
conspiracy becomes the agent or partner of every other
member.  The Government does not have to prove that all the
people named in the second superseding indictment were
members of the plan or that those who were members made any
kind of formal agreement.

The Government does not have to prove that the
members planned together all the details of the plan that
the second superseding indictment charges would be carried
out in an effort to commit the intended crime.  The heart of
a conspiracy is the making of the unlawful plan itself.  The
Government does not have to prove that the conspirators
succeeded in carrying out the plan.

The defendant can be found guilty of this crime
only if all the following facts are proved beyond a
reasonable doubt:  That two or more persons in some way
agreed to try to accomplish a shared and unlawful plan, that
the defendant knew the unlawful purpose of the plan and
willfully joined it.

A person may be a conspirator without knowing all
the details of the unlawful plan or the names and identities

of all the other alleged co-conspirators, but if the
defendant played only a minor part in the plan but had a
general understanding of the unlawful purpose of the plan
and willfully joined in the plan on at least one occasion,
that is sufficient for you to find the defendant guilty, but
simply being present at the scene of an event or merely
associating with certain people and discussing common goals
and interests does not establish proof of a conspiracy.  A
person who does not know about the conspiracy but happens to
act in a way that advances some purpose of one does not
automatically become a conspirator.

Murder – first degree.

To prove the crime of first degree premeditated
murder, the United States must prove the following three
elements beyond a reasonable doubt:  First, Paul Anderson is
dead; second, the death was caused by the criminal act of
the defendant; and, third, there was a premeditated killing
of Paul Anderson.

An act includes a series of related actions
arising from and performed pursuant to a single design or
purpose.

Killing with premeditation is killing after
consciously deciding to do so.  The decision must be present
in the mind at the time of the killing.  The law does not
fix the exact period of time that must pass between the

1  formation of the premeditated intent to kill and the

2  killing.  The period of time must be long enough to allow

3  reflection by the defendant.  The premeditated intent to

4  kill must be formed before the killing.

5          The question of premeditation is a question of

6  fact to be determined by you from the evidence.  It will be

7  sufficient proof of premeditation if the circumstances of

8  the killing and the conduct of the accused convince you

9  beyond a reasonable doubt of the existence of premeditation

10  at the time of the killing.

11          To prove aggravated assault with a deadly weapon,

12  the United States must prove the following four elements

13  beyond a reasonable doubt.  The first three elements define

14  assault.  First, the defendant intentionally and unlawfully

15  threatened, either by word or act, to do violence to

16  James Costa; second, at the time the defendant appeared to

17  have the ability to carry out the threat; third, the act of

18  the defendant created in the mind of James Costa a

19  well-founded fear that the violence was about to take place;

20  and fourth, the assault was made with a deadly weapon.

21          If the circumstances were such as to ordinarily

22  induce a well-founded fear in the mind of a reasonable

23  person, then James Costa may be found to have been in fear,

24  and all fear on the part of James Costa need not be shown.

25          A weapon is a deadly weapon if it is used or

1    threatened to be used in a way likely to produce death or

2    great bodily harm.  It is not necessary for the Government

3    to prove that the defendant had an intent to kill.

4              Aiding and abetting – agency.

5              It's possible to prove the defendant's guilt of a

6    crime even without evidence that the defendant personally

7    performed every act charged.  Ordinarily, an act a person

8    can do may be done by directing another person or agent, or

9    it may be done by acting with or under the direction of

10   others.  A defendant aids and abets a person if the

11   defendant intentionally joins with the person to commit a

12   crime.  A defendant is criminally responsible for the acts

13   of another if the defendant aids and abets the other person.

14             A defendant is also responsible if the defendant

15   directs or authorizes the acts of an agent, employee or

16   other associate.  But finding that a defendant is criminally

17   responsible for the acts of another person requires proof

18   that the defendant intentionally associated with or

19   participated in the crime, not just proof that the defendant

20   was simply present at the scene of a crime or knew about it.

21             In other words, you must find beyond a reasonable

22   doubt that the defendant was a willful participant and not

23   merely a knowing spectator.

24             It is a separate crime to use or carry a firearm

25   during and in relation to a violent crime.  The defendant

can be guilty of this crime only if all of the following facts are proved beyond a reasonable doubt:  One, that the defendant committed the violent crime charged in the second superseding indictment; and two, during and in relation to that crime, the defendant knowingly used or carried a firearm as charged in the second superseding indictment.

A firearm is any weapon designed or readily converted to expel a projectile by the action of an explosive.  The term includes the frame or receiver of any such weapon or any firearm muffler or silencer.

To use a firearm means more than a mere possession and more than proximity and accessibility to the firearm. It requires active employment of the firearm by brandishing or displaying it in some fashion.

To brandish a firearm means to show all or part of the firearm to another person or otherwise make another person aware of the firearm in order to intimidate that person.  The firearm need not be directly visible to the other person.

To carry a firearm is to have the firearm on one's person or transport the firearm, such as in a vehicle, from one place to another while committing the violent crime.

To use or carry a firearm in relation to a crime means that the firearm had some purpose or effect with respect to the crime and was not there by accident or

1    coincidence.   The firearm must have facilitated or had the

2    potential of facilitating the crime.

3              A defendant who aids and abets the crime of using

4    or carrying a firearm during and in relation to a crime --

5    let me start over.

6              A defendant who aids and abets the crime of using

7    or carrying a firearm during and in relation to a violent

8    crime can be found guilty even if the defendant did not

9    personally use or carry the firearm, but to be found guilty

10   on this basis the defendant must have actively participated

11   in the violent crime with advance knowledge that another

12   participant would use or carry a firearm during and in

13   relation to the violent crime.

14             Advance knowledge means knowledge at a time when

15   the defendant chose to begin or continue the defendant's

16   participation in the violent crime.   The defendant chose to

17   continue the defendant's participation if the defendant

18   learned of the firearm and continued to participate, but the

19   defendant did not choose to continue to participate if the

20   defendant learned of the firearm too late for the defendant

21   to be reasonably able to walk away.

22             If you find the defendant guilty of using or

23   carrying a firearm during or in relation to a crime of

24   violence, you must also determine if the defendant

25   brandished a firearm during and in relation to a crime of

1  violence.

2         As I said before, to brandish a firearm means to

3  show all or part of the firearm to another person or

4  otherwise make another person aware of the firearm in order

5  to intimidate that person.  The firearm need not be directly

6  visible to the other person.

7         The defendant is guilty of aiding and abetting the

8  brandishing of a firearm if he had advance knowledge that

9  another participant in the crime would display or make the

10 presence of a firearm known for purposes of intimidation.

11 The defendant need not have had advance knowledge that a

12 participant would actually brandish the firearm.  This

13 requirement is satisfied if the defendant knew that a

14 participant intended to brandish a firearm to intimidate if

15 the need arose.

16        If you find the defendant guilty of using or

17 carrying a firearm during and in relation to a crime of

18 violence, you must then determine whether the firearm was

19 discharged, even if accidentally.  To discharge a firearm

20 means to cause the weapon to fire and expel a projectile.

21 To aid and abet the possession of carrying a firearm that

22 was discharged, the defendant need not have had advance

23 knowledge that the discharge would occur.

24        Title 18, United States Code, Section 924(j) makes

25 it a crime to cause the death of another person through the

use of a firearm during and in relation to a crime of
violence.  For you to find a defendant guilty, the
Government must prove each of the following beyond a
reasonable doubt:  First, that the defendant used or carried
a firearm; second, that the defendant did so during and in
relation to a crime of violence that may be prosecuted in
Federal Court; and third, that the defendant caused the
death of a person through the use of a firearm, the killing
of whom was murder as defined in 18 United States Code
Section 1111.

It is a Federal crime to murder another
human being within the territorial jurisdiction of the
United States.  Murder is the unlawful killing of a human
being with malice aforethought.  The defendant can be found
guilty of the Federal crime of first degree murder only if
all the following facts are proved beyond a reasonable
doubt:  One, the victim, Paul Anderson, was killed; two, the
defendant caused the death of the victim with malice
aforethought; three, the defendant did so with premeditated
intent; and four, the killing took place within the
territorial jurisdiction of the United States.

To kill with malice aforethought is to intend to
take someone's life deliberately and intentionally or to
willfully act with callous and wanton disregard for human
life.  It does not matter whether the defendant hated the

victim or felt any ill will toward the victim at the time,
but the Government must prove beyond a reasonable doubt that
the defendant intended to kill or willfully acted with
callous and wanton disregard for the consequences, knowing
that a serious risk of death or serious bodily harm would
result.

Proof of premeditated intent is required
in addition to proof of malice aforethought.

To kill with premeditated intent is to kill in
cold blood after the accused has had time to think over the
matter and form the intent to kill.  There is no exact
amount of time that must pass between forming the intent to
kill and the killing itself, but it must be enough time for
the killer to be fully conscious of having the intent to
kill.

If the Government -- I'm sorry.  The Government
does not have to prove that the victim was the person the
defendant intended to kill.  If a person has a premeditated
intent to kill one person and in attempting to kill that
person kills someone else instead, the killing is
premeditated.

If you find beyond a reasonable doubt that the
crime occurred at the location described in the second
superseding indictment, that location is within the
territorial jurisdiction of the United States.

1              When the Court initially read the charges in the

2    second superseding indictment, it contained references to

3    cocaine, marijuana and methamphetamine in Count Nine.  Those

4    substances are no longer at issue in this case with respect

5    to Count Nine and have been removed from the second

6    superseding indictment.  The only substance that remains at

7    issue in Count Nine of the second superseding indictment is

8    heroin.

9              It is a separate Federal crime for anyone to

10   conspire to knowingly possess with intent to distribute

11   heroin.  Title 21 makes it a crime for anyone to knowingly

12   possess heroin with intent to distribute it.

13             A conspiracy is an agreement by two or more

14   persons to commit an unlawful act.  In other words, it's a

15   kind of partnership for criminal purposes.  Every member of

16   the conspiracy becomes the agent or partner of every other

17   member.  The Government does not have to prove that all of

18   the people named in the second superseding indictment were

19   members of the plan or that those who were members made any

20   kind of formal agreement.  The heart of a conspiracy is the

21   making of the unlawful plan itself, so the Government does

22   not have to prove that the conspirators succeeded in

23   carrying out the plan.

24             The defendant can be found guilty only if all the

25   following facts are proved beyond a reasonable doubt:  One,

1  that two or more persons in some way agreed to accomplish a

2  common -- I'm sorry, agreed to accomplish a shared and

3  unlawful plan to possess heroin; two, the defendant knew the

4  unlawful purpose of the plan and willfully joined in it;

5  three, the object of the unlawful plan was to possess with

6  intent to distribute heroin.

7          A person may be a conspirator even without knowing

8  all the details of the unlawful plan or the names and

9  identities of all the other conspirators.

10         If a defendant played only a minor part in the

11 plan but had a general understanding of the unlawful purpose

12 of the plan and willfully joined the plan on at least one

13 occasion, that is sufficient for you to find the defendant

14 guilty, but simply being present at the scene of an event or

15 merely associating with certain people and discussing common

16 goals and interests does not establish proof of a

17 conspiracy.

18         Also, a person who does not know about a

19 conspiracy but happens to act in a way that advances some

20 purpose of one does not automatically become a conspirator.

21         Members of the jury, Exhibits 501-T through 510-T

22 have been identified as typewritten transcripts of the oral

23 conversations heard on the tape recordings received in

24 evidence as 501 through 510.  The transcripts also purport

25 to identify the speakers engaged in the conversation.

1    I have admitted the transcripts for the limited

2    and secondary purpose of helping you follow the content of

3    the conversations as you listen to the tape recordings and

4    also to help you identify the speakers, but you are

5    specifically instructed that whether the transcripts

6    correctly reflect the content of the conversation or the

7    identity of the speakers is entirely for you to decide based

8    on your own evaluation of the testimony you have heard about

9    the preparation of the transcripts and from your own

10   examination of the transcripts in relation to hearing the

11   tape recordings themselves as the primary evidence of their

12   own contents.  If you determine that the transcripts are in

13   any respect incorrect or unreliable, you should disregard

14   them to that extent.

15   Certain charts -- I'm sorry.  Certain exhibits in

16   the form of charts, summaries, calculations and the like

17   have been received in evidence.  Such exhibits are received

18   in evidence where voluminous writings, documents and records

19   are involved.  These exhibits are available for your

20   assistance and convenience in considering the evidence.

21   Such exhibits do not constitute any findings by the Court

22   and are the Government's contention as to what the evidence

23   shows.

24   You have been permitted to take notes during the

25   trial.  Most of you, perhaps all of you, have taken

1    advantage of that opportunity.  You must use your notes only

2    as a memory aid during deliberations.  You must not give

3    your notes priority over your independent recollection of

4    the evidence and you must not allow yourself to be unduly

5    influenced by the notes of other jurors.  I emphasize that

6    notes are not entitled to any greater weight than your

7    memories or impression about the testimony.

8            Your verdict, whether guilty or not guilty, must

9    be unanimous.  In other words, you must all agree.

10           Your deliberations are secret.  You will never

11   have to explain your verdict to anyone.

12           Each of you must decide the case for yourself, but

13   only after fully considering the evidence with the other

14   jurors.  You must discuss the case with one another and try

15   to reach an agreement.  While you're discussing the case, do

16   not hesitate to re-examine your own opinion and change your

17   mind if you become convinced that you were wrong, but do not

18   give up your honest beliefs just because others think

19   differently or because you simply want to get the case over

20   with.

21           Remember that in a very real way you are judges,

22   judges of the facts.  Your only interest is to seek the

23   truth from the evidence in the case.

24           Let me add with respect to that that during your

25   deliberations you must work together.  You must not go out

1   separately in different groups and deliberate.  All of your

2   deliberations must be as a group.

3        When you get to the jury room, choose one of your

4   members to act as a foreperson.  The foreperson will direct

5   your deliberations and will speak for you in court.

6        A verdict form for each defendant has been

7   prepared for your convenience.

8        Can you go to the verdict forms first with

9   Mr. Cosimano.

10        This is what the verdict form looks like, and it

11   has questions that you have to answer.  They are numbered.

12        As to Mr. Cosimano, you will answer as to

13   Count One, as to the offense of conspiracy to commit murder,

14   namely in connection with the death of Paul Anderson, in aid

15   of racketeering activity, in violation of 18 United States

16   Code Section 1959(a)(5), you will answer:  We, the jury,

17   unanimously find the defendant, Christopher Cosimano, either

18   guilty or not guilty and you will check the blank

19   in accordance with your unanimous finding.

20        Similarly, in Count Two, as to the offense of

21   murder in aid of racketeering activity, namely in connection

22   with the death of Paul Anderson, in violation of 18 United

23   States Code Section 1959(a)(1), or as to the aiding and

24   abetting of another who committed that offense, in violation

25   of 18 United States Code Section 1959(a)(1) and 2, we,

the jury, find -- we, the jury, unanimously find the
defendant, Christopher Cosimano, and you will answer either
guilty or not guilty.

As to the offense of carrying a firearm during and
in relation to a crime of violence, namely, in connection
with the death of Paul Anderson as described in Count Two,
in violation of 18 United States Code Section 924(c)(1)(A),
or as to the aiding and abetting of another who committed
that offense, in violation of 18 United States Code Section
924(c)(1)(A)(iii) and 2, we, the jury, unanimously find the
defendant, Christopher Cosimano, either guilty or not
guilty.  You'll check that block based on your unanimous
decision.

If you find Christopher Cosimano not guilty of the
offense charged in Count Three, then you don't answer these
other questions on this page, you would go to Count Four.
If you do find the defendant Christopher Cosimano guilty of
the offense in Count Three or of aiding and abetting another
who committed that offense, then you'll need to answer the
following questions and then go to Count Four.

You'll answer:  We, the jury, having found
Christopher Cosimano guilty of the offense charged in
Count Three or of aiding and abetting another who committed
that offense, further find with respect to that count that
the firearm was brandished.  If you find that it was

1    brandished unanimously then you would check yes.  If you do

2    not unanimously agree that it was brandished you will check

3    no.

4            You will then answer the question:  We, the jury,

5    having found Christopher Cosimano guilty, either directly or

6    by aiding and abetting, you will answer whether the firearm

7    was discharged, and you have to unanimously agree either yes

8    or no.

9            As to Count Four then, whether you have answered

10   guilty or not guilty to Count Three, you still have to

11   answer Count Four, and you would answer as to the offense of

12   using or carrying a firearm during or in relation to a crime

13   of violence in connection with the death of Paul Anderson as

14   described in Count Two and in the course of such conduct

15   causing death, in violation of Federal law, or to aiding and

16   abetting that offense, you would answer the question:  We,

17   the jury, unanimously find the defendant, Christopher

18   Cosimano, either guilty or not guilty.

19           If you find him not guilty then you would proceed

20   to Count Six.  If you find him guilty as to Count Four or

21   aiding and abetting that offense then you'll have to answer

22   the next two questions, whether the firearm was brandished

23   again and whether the firearm was discharged again, and

24   again your answers must be unanimous.

25           And then as to Count Six, as to the offense of

1   assault with a dangerous weapon in aid of racketeering

2   activity in connection with James Costa, in violation of

3   18 U.S.C. 1959(a)(3) or as to the aiding and abetting of

4   another who committed that offense in violation of 18 U.S.C.

5   1959(a)(3) and 2, you'll answer:  We, the jury, unanimously

6   find the defendant, Christopher Cosimano, either guilty or

7   not guilty.

8        And as to Count Seven, as to the offense of using

9   or carrying a firearm during and in relation to a crime of

10  violence in connection with James Costa, as described in

11  Count Six, or aiding and abetting that offense, then you'll

12  have to answer:  We, the jury, find the defendant,

13  Christopher Cosimano, either guilty or not guilty.

14       If you find him not guilty to the offense charged

15  in Count Seven then you'll date the form.  If you find him

16  guilty of the offense of aiding and abetting another, that

17  is the offense of using or carrying a firearm, you'll need

18  to answer the next questions, again, whether the firearm was

19  brandished, yes or no, and whether the firearm was

20  discharged, yes or no, and then you will date and sign the

21  verdict form in accordance with that instruction.

22       Going to Mr. Mencher, the verdict form is similar.

23       As to the offense of conspiracy to commit murder,

24  namely in connection with the death of Paul Anderson, in aid

25  of racketeering activity, in violation of 18 U.S.C.

1959(a)(5), you will answer:  We, the jury, unanimously find

the defendant, Michael Mencher, either guilty or not guilty

based upon your unanimous decision.

As to the offense of murder in aid of racketeering

in connection with the death of Paul Anderson, in violation

of the law, or aiding and abetting in violation of the law,

we, the jury, unanimously find the defendant,

Michael Mencher, and then you'll answer either guilty or not

guilty based upon your unanimous decision.

In Count Three, as to the offense of using or

carrying a firearm during and in relation to a crime of

violence, namely, in connection with the death of

Paul Anderson as described in Count Two, in violation of the

law set forth therein, or aiding and abetting the same, we,

the jury, unanimously find the defendant, Michael Mencher,

and you'll have to decide unanimously either guilty or not

guilty.

If you find him not guilty of the offense in

Count Three, then go directly to the next page and deal with

the question on Count Four.  If you find him unanimously

guilty of Count Three or aiding and abetting another, then

you'll answer the next questions, and this has to do with

whether the firearm was brandished, you must agree

unanimously yes or no, and whether the firearm was

discharged, again, answering yes or no unanimously.

```
 1              Then you would proceed to Count Four, either way.
 2    If you found him guilty or not guilty, you still have to
 3    answer Count Four.  As to the offense of using or carrying a
 4    firearm during and in relation to a crime of violence,
 5    namely, in connection with the death of Paul Anderson, as
 6    described in Count Two, and in the course of such conduct
 7    causing death, in violation of 18 United States Code Section
 8    924(j)(1), or as to aiding and abetting another who
 9    committed that offense in violation of 18 U.S.C. Section
10    924(j)(1) and 2, you'll answer:  We, the jury, unanimously
11    find the defendant, Michael Mencher, either guilty or not
12    guilty.
13              If you find him not guilty then you'll go straight
14    to the question at Count Nine.  If you find him guilty
15    you'll need to answer the two questions about brandishing
16    and discharging the firearm, and you'll have to agree
17    unanimously either yes or no to those follow-up questions,
18    and then you would go to Count Nine.
19              As to the offense of conspiring to possess with
20    intent to distribute heroin, a controlled substance, in
21    violation of 21 U.S.C. 846, you'll answer this question:
22    We, the jury, unanimously find the defendant, Michael
23    Mencher, either guilty or not guilty, and that will complete
24    your labor on that verdict form and you will sign and date
25    it and return it back to the courtroom.
```

1          If you'll go back to that last page again for me.

2          Once you've taken the verdict form with you to the

3    courtroom and when you've all agreed on verdict, your

4    foreperson will fill in the form, sign it, date it and carry

5    it back to the courtroom.  You will be returned as a group

6    to the courtroom.

7          If you wish to communicate with me at any time,

8    please write down your message or question and give it to

9    Mr. Anderson or whoever is representing him.  He will then

10   bring it to me and I will respond as promptly as possible,

11   either in writing or by talking to you in the courtroom.

12   But I caution you not to tell me at any time how many jurors

13   have voted one way or the another at any time you should

14   communicate with me.

15         Also I caution you to be patient with the Court in

16   responding to your questions, because I have to confer with

17   the lawyers before I do so, so it may take some time.  So if

18   there's a question, be patient with the Court in presenting

19   its answer.

20         That concludes the presentation of the evidence,

21   the arguments and the law, and so now we are turning the

22   matter over to you as judges of the facts in following that

23   law.

24         May I see counsel at sidebar.

25              *(The following bench conference was held.)*

```
1              THE COURT:  Two things.  It struck me in reading
2    the instructions that we don't have an instruction or a
3    directive to them if they don't find guilt as to the
4    shooting or the death of Paul Anderson or the assault of
5    Costa, that they don't answer the questions about the use of
6    the firearm or the discharge of the firearm, and I don't --
7    I haven't thought about it, but you should think about it in
8    the next few minutes, because we can alter it when we send
9    that instruction back to them on the verdict form.
10             Secondly, I assume that everyone agrees that the
11   alternates are 13, 14, 15 and 16, the last four in the box;
12   is that right?
13             MR. GAMMONS:  Yes, Your Honor.
14             MR. WISE:  Yes, Your Honor.
15             THE COURT:  And that is Nicholas Vescera, the
16   younger guy on the front row; Karen Stevenson;
17   Bobbie Crosby; and Robert Keen; and these are the last four
18   people closest to me on the front row.  Everyone agrees?
19             MR. GAMMONS:  Yes, ma'am.
20             MS. BORGHETTI:  Yes, Your Honor.
21             MR. WISE:  Yes.
22   (End of bench conference; proceedings resume in open court.)
23             THE COURT:  All right.  This is my least favorite
24   part of a trial and that's when I have to excuse the
25   alternates.  In our system of justice there is a requirement
```

1  that there are 12 people who serve as the jury in a criminal

2  case, and so 16 of you were seated in this case because you

3  never know when issues might come up in the course of the

4  case that jurors have to be excluded, and so the following

5  people are the alternates:  Mr. Vescera, Ms. Stevenson,

6  Mr. Crosby and Mr. Keen -- I mean Ms. Crosby and Mr. Keen.

7  That means you will not be deliberating with the jury, but

8  I am cautioning you that you must not start looking at

9  anything, acting in any way differently than you have during

10  the course of the trial, because if in the unlikely

11  circumstance during deliberations one of the jurors would

12  have to be excused, the Court would then have to call one of

13  you back in to fill in and they would have to start their

14  deliberations all over again with your being present,

15  because there have to be at least 12 persons in the jury at

16  all times.

17         So on behalf of the parties, the Court thanks you

18  in advance for your work in this case, for your presence,

19  for your attendance and your attention, and understand that

20  this is a necessary part of this process.  We will advise

21  you if you care to know what happened with the case.  Once

22  it's over someone from my office will call you, or you can

23  feel free to call in, but you will be advised in any event,

24  but again, thank you for your service.

25         Do they need to go back down to Jury at this time

1    or no?

2              COURTROOM DEPUTY:  Yes, Your Honor.

3              THE COURT:  If you'll go back down to the jury

4    assembly room where you started on the very first day,

5    they'll give you further instructions.

6              Do any of you have any personal belongings in the

7    jury deliberation room?  If you do then you'll need to go

8    back and retrieve those and then you'll go back to the jury

9    room on the fourth -- is it fourth floor or third floor?

10             COURTROOM DEPUTY:  Third floor, Your Honor.

11             THE COURT:  Third floor for any instructions.

12             Again, thank you for your service, and the four of

13   you are free to leave at this time.  Leave your notes on the

14   chairs.

15                  (Alternate jurors exit proceedings.)

16             THE COURT:  We will -- I understand lunch has been

17   provided.  Let them know if they want to grab a box, they

18   can.

19             Lunch has been provided, so you can now retire to

20   the jury room, make the decision about your foreperson and

21   communicate that to Mr. Anderson and then you take what time

22   you need.  You decide your schedule, you decide how long you

23   stay, but this is not back in the days when jurors stayed

24   until midnight and so forth.  We have to shut the building

25   down because we have to pay for the air and the lights and

1  you're paying for that when you pay your taxes, so that's a

2  necessary thing that we won't be going much past a normal

3  business day, and then you are free also -- what I was going

4  to ask you yesterday and I hesitated, if you want to stay

5  over until Friday rather than skipping and coming back on

6  Monday, you're also free to do that.  I will be here, the

7  Court will be open, and you can make that decision if

8  necessary when it comes up.

9          Thank you for your service.  All the exhibits and

10  the evidence that has come in will go back, as will verdict

11  forms for you to scratch on, a formal verdict form for you

12  to use, and then copies of the instructions will be given to

13  you.

14          Thank you very much.  You may be excused.

15              (Jury exits proceedings.)

16          THE COURT:  Any thoughts about the question the

17  Court asked at sidebar?  I just haven't had a chance to

18  reflect on that question just reading through it.

19          MR. GAMMONS:  Yes, Your Honor.  I think it would

20  clarify if we use similar language after Count Two in the

21  verdict form, something to the effect of if you find -- and

22  similar for Mr. Mencher, if you find Christopher Cosimano

23  not guilty of the offense charged in Count Two, proceed to

24  Count Six.  If you find Christopher Cosimano guilty of the

25  offense charged in Count Two, or of aiding and abetting

1    another who committed that offense, proceed to Count Three.

2              THE COURT:  As to Mencher, you would move to which

3    count?

4              MR. GAMMONS:  Nine.

5              THE COURT:  Nine.  So they have to answer One

6    without regard to that, then they answer Two, and if they

7    find not guilty as to Count Two they would proceed to just

8    answer Count Nine; is that right?

9              MR. GAMMONS:  Yes, ma'am.

10             THE COURT:  And then with respect to Mr. Cosimano,

11   if they find not guilty as to Count Two, they would proceed

12   to Count Six.

13             MR. GAMMONS:  Yes, ma'am.

14             THE COURT:  We don't have to read the verdict form

15   to the jury at all.  We can just have a written verdict form

16   just as a matter of course.  I would propose that we just

17   make that addition to the two verdict forms and send them

18   back to the jury room with those verdict forms.  If anyone

19   wishes me to bring the jury back in for that purpose, I can.

20             MR. GAMMONS:  Your Honor, the United States is

21   fine with just making those edits and sending it back to the

22   jurors.

23             MR. WISE:  Your Honor, I'm fine with that as well.

24   I would add though I think we would -- we would need to

25   include similar language after Count Six though, saying if

```
 1   you find Mr. Cosimano not guilty as to that count, then
 2   proceed to sign and date the verdict form, because I think
 3   it would be -- we're essentially talking about the same
 4   thing with regards to counts Six and Seven.
 5              THE COURT:  That's correct.
 6              Is that agreeable to the Government?
 7              MR. GAMMONS:  Yes, Your Honor.
 8              THE COURT:  All right.  We'll make those changes
 9   and get the verdict forms back to the jury consistent with
10   those directives.  If you want to stay around, we'll get you
11   a copy of what goes back in just a few minutes.
12              MS. BORGHETTI:  And, Judge, for the record,
13   I agree to the change.
14              THE COURT:  All right.  Thank you.
15              Anything else before we recess?
16              MR. GAMMONS:  Not from the United States.
17              MR. WISE:  No, Your Honor.
18              MS. BORGHETTI:  No, Your Honor.
19              THE COURT:  And the parties should stay in close
20   proximity and provide numbers to our staff so that we can
21   locate you quickly to get you reconvened if the jury
22   requires it for any reason.  I typically instruct the
23   lawyers to stay around closer in the first couple of hours,
24   then maybe after that, but that's left to your decision.
25              They're probably going to eat lunch and so forth,
```

 1   but who knows what they'll do.

 2             Court stands in recess.  Thank you.

 3                      - - - - -

 4        (Recess at 12:48 p.m. until 2:46 p.m.)

 5                      - - - - -

 6             THE COURT:  The jury has advised the Court that

 7   they would like to see the firearms that were admitted into

 8   evidence, and so -- we can't send them back to the jury

 9   room.  They already have the photographs.  So that's all

10   they're asking for.  They're asking to hold the firearms.

11   For what reason, I don't know.  I don't know that there's

12   any reason they cannot.

13             Does the Government oppose allowing the jury to

14   hold the weapon?

15             MR. GAMMONS:  No, Your Honor.

16             MR. WISE:  No, Your Honor.

17             MS. BORGHETTI:  No, Your Honor.

18             THE COURT:  All right.  And they were already --

19   they already had them displayed to them, so presumably

20   they're not asking for them to be held up in the air again,

21   and so I'm inclined to just let them hold the weapon,

22   obviously without any ammunition.

23             And as I understand it, the weapons are tied; is

24   that right?

25             MR. GAMMONS:  Yes, Your Honor, and made safe.

```
 1              THE COURT:  All right.  The precise request:  We
 2   would like to see the firearms up close, and it's signed by
 3   the foreperson, Patrick Feagans.
 4              Please re-call the jury.
 5              MR. GAMMONS:  Your Honor, would you like us to --
 6   we have them with us.  Do you want us to put them up there,
 7   or --
 8              THE COURT:  Once they come in I'll have
 9   Mr. Anderson take them.
10              MR. GAMMONS:  Yes, Your Honor.
11                   (Jury re-enters proceedings.)
12              THE COURT:  Mr. Feagans, you are the foreperson;
13   is that right?
14              JUROR FEAGANS:  Yes, ma'am.
15              THE COURT:  And my understanding is that the jury
16   wishes to see the weapon -- the weapons up close; is that
17   right?
18              JUROR FEAGANS:  Yes, ma'am.
19              THE COURT:  All right.  Mr. Anderson, would you
20   please retrieve the weapons, one at a time, I suppose.
21   Well, I guess both of them.  You can just pass them down,
22   beginning with Ms. Hughes.
23              All right.  The jury has also posed a second
24   question that I need for the jury to step out for a minute
25   because I need to clear it with counsel.
```

1           Please step out.

2               *(Jury exits proceedings.)*

3           THE COURT:  Please be seated.

4           This is the jury's question:  If the intent is to

5   beat up someone and it turns into murder, is that conspiracy

6   to commit murder or conspiracy to commit assault?  If the

7   intent is to beat up someone and it turns into murder,

8   is that conspiracy to commit murder or conspiracy to commit

9   assault?

10          Does the Government care to propose a response?

11          MR. GAMMONS:  Your Honor, I think it would be

12  appropriate just to tell them that the law that they have in

13  front of them is what they should consider in evaluating the

14  charges.

15          THE COURT:  Does the defense have a response?

16          MR. WISE:  Your Honor, my concern is they may be

17  confused by some kind of -- there could be a transfer of

18  intent, I think we could all agree on that, but if the

19  intent -- if the initial intent was for an assault and

20  battery and someone later developed intent to murder,

21  I think they would need -- I think an instruction to the

22  effect of:  For the offense of murder to be committed, there

23  must be an intent to commit murder.  I mean, that is the

24  law.

25          So I think the nature of their question, it would

1    be kind of dangerous to just leave as "you have been given

2    the law," because I think they're kind of confused.  That's

3    what I'm reading into that.

4              THE COURT:  Ms. Borghetti?

5              MS. BORGHETTI:  I'll concur with my co-counsel.

6              THE COURT:  Concur in what regard?

7              MS. BORGHETTI:  I'd ask the same.

8              THE COURT:  Ask the same what?

9              MS. BORGHETTI:  That they be told about the

10   intent.

11             THE COURT:  What would they be told?

12             MS. BORGHETTI:  Could we have one moment, Judge?

13             THE COURT:  Yes.

14             MS. BORGHETTI:  I would ask that -- to find either

15   defendant guilty of premeditated murder, you must find

16   intent, premeditated intent.

17             THE COURT:  They're not asking about -- that's not

18   their question, what it takes to find murder.  Their

19   question is what does it take to find conspiracy to commit

20   murder.  They seem to be asking whether if, perhaps along

21   the way to meeting Mr. Anderson, if they initially intended

22   to beat him up and then later decided to kill him, could

23   that be conspiracy to commit murder or is that conspiracy to

24   commit assault.  That's kind of what it sounds like they're

25   asking to me.

```
1           MR. WISE:  Your Honor, could you read the question
2    again?  Would you mind?  I'm sorry.
3           THE COURT:  If the intent is to beat someone up
4    and it turns into murder, is that conspiracy to commit
5    murder or conspiracy to commit assault?
6           MR. GAMMONS:  Your Honor, I'm hesitant to
7    introduce anything new outside the instructions.  I think
8    it's a little bit ambiguous when they say "and it turns
9    into," whether the "it" is it changes from conspiracy to
10   commit assault to conspiracy to commit murder, or the
11   conspiracy to commit assault turns into a murder.
12          As I said a few moments ago, I think that the
13   instructions governing what they should be deciding is in
14   front of them and -- maybe rereading them conspiracy in
15   relation to this.  I'm just very reluctant and opposed to
16   introducing anything new outside the four corners of the
17   jury instructions in this case.
18          THE COURT:  I am inclined to instruct the jury
19   that the law related to this case has been presented to them
20   in the jury instructions and they should follow those jury
21   instructions that have been provided to them.  I'm reading
22   back through the instructions and we give a clear
23   instruction on conspiracy, and in the 1959 instruction it is
24   clear that as to Count One of the second superseding
25   indictment that the underlying offense is conspiracy to
```

1   commit murder, and we've told them that conspiracy -- that

2   the intent to commit murder can be formed at some point so

3   long as it's sufficiently in advance of the offense to

4   constitute premeditation, that it's left up to them whether

5   there's sufficient amount of time to have satisfied that

6   premeditation or intent, and I think that between the 12 of

7   them they can figure out that you look at all three of those

8   instructions together to make a determination, and if it is

9   their view that initially either or both of the defendants

10  intended to go and beat up Paul Anderson and at some point

11  changed their mind along the way and decided that it was to

12  kill him, then they can decide whether that decision was the

13  decision of one person or both people or was or was not a

14  conspiracy, and then they can make a decision.

15          So my intent is to say to them:  The law regarding

16  this case has been presented to you in the jury instructions

17  and you should follow those instructions that have been

18  provided in reaching your verdict.

19          Any objection from the Government?

20          MR. GAMMONS:  No, Your Honor.

21          THE COURT:  From the defense?

22          MR. WISE:  No, Your Honor.

23          MS. BORGHETTI:  No objection.

24          THE COURT:  All right.  Please re-call the jury.

25                  *(Jury re-enters proceedings.)*

1          THE COURT:  Mr. Feagans, the Court reads the
2  question thusly:  If the intent is to beat up someone and it
3  turns into murder, is that conspiracy to commit murder or
4  conspiracy to commit assault.  Is that the question?
5          JUROR FEAGANS:  Yes, ma'am.
6          THE COURT:  The answer is:  The law regarding this
7  case has been presented to you in the jury instructions and
8  you should follow those instructions that have been provided
9  in reaching your verdict.
10          JUROR FEAGANS:  Thank you.
11          THE COURT:  Thank you.  You may step out.
12              *(Jury exits proceedings.)*
13          THE COURT:  When this question arose, the question
14  came up of whether the defendants needed to be brought back
15  in the courtroom.  Because this is their trial and they have
16  the right to be present at all important aspects of their
17  trial, that answer is always going to be yes, unless it's a
18  question of can we leave now or can we go to lunch or can
19  you give us -- we can't find Exhibit 32.  Any type of
20  substantive question that comes up, I'll have the defendants
21  present in the courtroom unless they give conduct reasons to
22  have to be excluded from their trial.
23          Court stands in recess.
24                   - - - - -
25          (Recess at 3:07 p.m. until 4:34 p.m.)

```
 1              THE COURT:  The jury has sent in a note indicating
 2    the following:  We don't believe we're going to finish by
 3    5:00.  We request to meet again Monday at 9:00 a.m.  Signed
 4    by the foreperson.
 5              Is there any objection from the Government?
 6              MR. GAMMONS:  No, Your Honor.
 7              THE COURT:  From the defense?
 8              MR. WISE:  No, Your Honor.
 9              MS. BORGHETTI:  No, Your Honor.
10              THE COURT:  Thank you.  Please re-call the jury.
11                   (Jury re-enters proceedings.)
12              THE COURT:  Mr. Feagans, the Court has received a
13    note from the jury:  We don't believe we're going to finish
14    by 5:00, we request to meet again Monday at 9:00 a.m.
15    Is that the decision of the jury?
16              JUROR FEAGANS:  Yes, ma'am.
17              THE COURT:  That's fine.  You will be able to come
18    back in.  You don't have to meet at Jury, just come back up
19    to the jury deliberation area.
20              Mr. Feagans, it will be up to you to ensure that
21    no deliberations ensue until all members of the jury have
22    returned and are in place.  You can't begin partial
23    deliberations.
24              This is an unusually extenuated break from the
25    proceedings.  The Court would ask you to keep in mind the
```

```
 1    things you've heard in the courtroom and the presentation of
 2    the case to you.  There is a strong temptation to start
 3    reaching out to the internet, to other people.  I don't know
 4    if you all have become acquainted with each other.
 5    Sometimes there is a tendency for jurors to communicate with
 6    each other separately.  That is not allowed.  You cannot
 7    speak to one another and talk about the case and then come
 8    back in the jury room and begin deliberations after what
 9    will effectively be partial deliberation.  So do not do
10    that.  Do not speak to anyone.
11            There could be articles written about the case,
12    about the jurors coming back on Monday, and so forth and
13    so on.  Do not read any articles.  Do not communicate with
14    any people.  Do not communicate with your family members and
15    friends and others about anything having to do with this
16    case.  This is imperative.  You do not want to be the person
17    responsible for the Court having to retry this case, because
18    you could be called upon to pay the cost of that and you
19    don't want to be that person.
20            So enjoy your weekend, get caught up, I guess, on
21    your business affairs, and we will see you back on Monday at
22    nine o'clock.  And since you are sequestered for purposes of
23    deliberation, we would order lunch again for you when you
24    arrive on Monday, so you don't have to worry about bringing
25    your lunch or going out to get something, but of course
```

1   you're free to go out at lunchtime if you choose, as a jury.

2          Anything else that the Court needs to address

3   anyone to before we recess until Monday?

4          All right.  Thank you for your diligence.  We will

5   see you back Monday at nine o'clock.

6               *(Jury exits proceedings.)*

7          THE COURT:  Ladies and gentlemen, Monday you can

8   feel free to come back here at nine o'clock.  This looks

9   like an active jury that might have questions.  You can do

10   that, or if you don't want to come right back, maybe by 9:30

11   after they have settled and kind of gotten started you can

12   do that, but I'll leave that to your discretion over the

13   weekend.

14          Are there any issues the Court needs to address

15   before we adjourn for the weekend?

16          MR. GAMMONS:  Not from the United States.

17          MR. WISE:  No, Your Honor.

18          MS. BORGHETTI:  No, Your Honor.

19          THE COURT:  Thank you.  We are dismissed.

20               - - - - -

21          (Proceedings concluded at 4:39 p.m.)

22               - - - - -

23

24

25

1              C E R T I F I C A T E

2

3        This is to certify that the foregoing transcript

4   of proceedings taken in a jury trial in the United States

5   District Court is a true and accurate transcript of the

6   proceedings taken by me in machine shorthand and transcribed

7   by computer under my supervision, this the 9th day of

8   September, 2019.

9

10

11                              /S/ DAVID J. COLLIER

12

13                              DAVID J. COLLIER

14                              OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25