```
 1                IN THE UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION

 3

 4   UNITED STATES OF AMERICA,        )
                                      )
 5                 Plaintiff,         )
                                      )
 6                                    ) Case No.
             vs.                      ) 8:18-CR-00234-MSS-SPF-1
 7                                    )
                                      )
 8   CHRISTOPHER BRIAN COSIMANO,      )
                                      )
 9                 Defendant.         )

10

11

12   _____

13                       SENTENCING HEARING
              BEFORE THE HONORABLE MARY S. SCRIVEN
14                 UNITED STATES DISTRICT JUDGE

                        NOVEMBER 20, 2019
15                         9:20 A.M.
                        TAMPA, FLORIDA
16   _____

17

18

19

20

21         Proceedings recorded by mechanical stenography,
     transcript produced using computer-aided transcription.
22   _____

23                  DAVID J. COLLIER, RMR, CRR
                   FEDERAL OFFICIAL COURT REPORTER
24              801 NORTH FLORIDA AVENUE, 7TH FLOOR
                     TAMPA, FLORIDA  33602
25
```

```
1   APPEARANCES:

2

3   FOR THE GOVERNMENT:

4

5           Carlton Gammons

6           Natalie Hirt Adams

7           United States Attorney's Office

8           400 North Tampa Street, Suite 3200

9           Tampa, Florida  33602

10          (813) 274-6000

11

12  FOR THE DEFENDANT CHRISTOPHER BRIAN COSIMANO:

13

14          J. Jervis Wise

15          Brunvand, Wise P.A.

16          615 Turner Street

17          Clearwater, Florida  33756

18          (727) 446-7505

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                    – – – o0o – – –
 3            THE COURT:  Please call the case.
 4            COURTROOM DEPUTY:  Court calls Case Number
 5   8:18-CR-00234-MSS-SPF-1, U.S.A versus Christopher Brian
 6   Cosimano.
 7            Counsel, please state your appearances, starting
 8   with the Government.
 9            MR. GAMMONS:  Good morning.  Carlton Gammons and
10   Natalie Adams on behalf of the United States.
11            THE COURT:  Good morning.
12            MR. WISE:  Good morning, Your Honor.  Jervis Wise
13   on behalf of Mr. Cosimano.
14            THE COURT:  Good morning.
15            Please swear the defendant.
16            COURTROOM DEPUTY:  Please stand.  Please raise
17   your right hand.
18            Do you solemnly swear or affirm under penalty of
19   perjury that the statements you will give in these
20   proceedings will be the truth, the whole truth and nothing
21   but the truth?
22            THE DEFENDANT:  Yes, ma'am.
23            COURTROOM DEPUTY:  Please state your name for the
24   record.
25            THE DEFENDANT:  Christopher Brian Cosimano.
```

1          THE COURT:  Thank you, sir.  You may be seated.

2          Mr. Cosimano, sir, you're under oath.  You must

3  give truthful statements.  If you give false statements, you

4  face penalties of perjury, false statement and obstruction.

5  Do you understand that?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Pull that microphone toward the

8  defendant so he can be heard.

9          Do you understand that?

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  At the same time, it is not my purpose

12  to induce you to give false answers or mislead you, so if

13  you don't understand something that I'm saying to you or if

14  you need to speak with your lawyer, ask for clarification or

15  ask for a chance to speak with counsel.  Do you understand

16  that?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Sir, on August the 12th, 2019, a jury

19  found you guilty of Counts One through Four of the Second

20  Superseding Indictment.  On November the 6th, 2019 the Court

21  granted the Government's motion and dismissed Count Four

22  against you.

23          Count One charged you with conspiracy to commit

24  murder in aid of racketeering activity, in violation of

25  18 United States Code Section 1959(a)(5).  Count Two charged

1  you with murder in aid of racketeering, in violation of

2  18 United States Code Section 1959(a)(1).  Count Three

3  charged you with discharging a firearm during a crime of

4  violence, in violation of 18 United States Code Section

5  924(c)(1)(A)(iii).  The Court adjudges you guilty of those

6  offenses based upon that jury verdict, and now it is the

7  stage in the proceedings where it's my job to decide what

8  your sentence will be.  I make that decision by conferring

9  with you, your lawyer and counsel for the Government and

10  reviewing the submissions made on behalf of each of you

11  during the presentencing phase of the litigation.

12          Has the defense had an opportunity to review the

13  presentence report?

14          MR. WISE:  Yes, Your Honor.

15          THE COURT:  Any objection to its factual accuracy?

16          MR. WISE:  Yes, Your Honor.  We have objections

17  that are noted in the addendum.

18          THE COURT:  Take the microphone back for yourself,

19  Mr. Wise.

20          MR. WISE:  Yes, Your Honor.  We do have objections

21  to the factual accuracy, specifically paragraphs 36, 38, 39,

22  40, 51, 56, 59, 108 and 109.  These are objections that

23  essentially pertain to matters that were litigated at trial,

24  but essentially the 69'ers motorcycle club qualifying as an

25  enterprise or that Mr. Cosimano was armed with a firearm or

1    that he had any intent that Mr. Anderson would be killed.

2            THE COURT:  All right.  The Court would note the

3    objections for the record, they are preserved for purposes

4    of an appeal, the jury having found guilt in the case on the

5    weight of the evidence offered by the Government.

6            Any other objections to the factual accuracy?

7            MR. WISE:  No, Your Honor.

8            THE COURT:  Any objection to the guideline

9    calculations?

10           MR. WISE:  No.

11           THE COURT:  Does the Government have any objection

12   to the factual or legal accuracy of the presentence report?

13           MR. GAMMONS:  No, Your Honor.

14           THE COURT:  The Court has reviewed the sentencing

15   memos submitted by the defendant.  I find that his arguments

16   are foreclosed by binding legal precedent.  The argument

17   concerning the, I guess, inequitable match of the Florida

18   criminal statute with the Federal counterpart is rejected.

19           Is there any other legal argument that you wish to

20   make that's not set forth in the sentencing memorandum with

21   respect to this defendant?

22           MR. WISE:  Nothing additional, no.

23           THE COURT:  All right.  Does the defendant wish to

24   allocute, which is his right?

25           MR. WISE:  He has indicated to me that he does.

1            THE COURT:  All right.  Let me explain to him the

2      penalties first and then we'll take his statement in

3      allocution.

4            The Court adopts the factual statements and

5      guideline calculations in the presentence report.  The

6      defendant has a total offense level of 43, he has a criminal

7      history category of III.  The guidelines and the statute

8      direct a mandatory life sentence plus ten years consecutive

9      as to Count Three.  There's a one to three year period of

10     supervised release for Count One and a two to five year

11     period of supervised release as to Counts Two and Three,

12     rendered essentially a nullity in light of the mandatory

13     life sentence.

14            There is a restitution -- there is no restitution

15     obligation, the fine range is between 50,000 and $500,000,

16     and there is a $100 special assessment for each offense, so

17     a total of $300 in special assessments.

18            Is there a victim present in the courtroom who

19     wishes to speak?

20            MR. GAMMONS:  No, Your Honor.

21            THE COURT:  Does the defendant wish to allocute?

22     Let me hear from you, sir.

23            THE DEFENDANT:  Yes, ma'am.

24            THE COURT:  Let me hear from you.

25            THE DEFENDANT:  Ma'am, I have quite a bit of

1   things that's being going on since day one of this incident.

2            First I want to address the Anderson family if

3   they are here.  I definitely deeply apologize for what

4   occurred.  I'm not going to deny the fact I wasn't there,

5   because I was there.  Now, what occurred at the very end,

6   that was not my intent whatsoever.  I was actually going to

7   fight Mr. Anderson, and I told that to Mr. Blake Childress

8   from day one.  Exactly what I told him from day one all the

9   way up until the trial, everything lined up.

10           It kind of hit me a little bit harder when I was

11  in here because come to find out that my brother,

12  Mr. Robinson, was actually dating Anderson's second cousin,

13  and I have recently spoken to her, and I just found this

14  information out possibly about three months ago, like

15  literally right after trial, and it kind of hit me a little

16  bit harder because me and her were really close, even though

17  my brother and her are broken up.  I'm just pretty

18  dumbstruck about that, you know, being that it was that

19  close.

20           I wish there could have been a different route,

21  you know, things could have gotten handled.  There's no

22  excuse, I should say, for what happened at the very end.

23  You know, every action, there's a reaction, and that's all

24  I can say, but I wasn't the one that got accused -- I wasn't

25  the one that pulled this trigger.  I can say that much.

1    Like I said, I was there, but I didn't pull the trigger.

2           And the whole time, from day one, Mr. Guinto lied

3    constantly, not only to the ATF but to the prosecutors, all

4    the way up to the day of the trial.  Not only did he lie,

5    the publicity destroyed my name, battered me really bad.

6    They released all kinds of records saying I'm the one that

7    did this and Alan Guinto witnessed me doing this, from A to

8    Z.  And then right before I was schedule for trial, I think

9    it was March and April of '18, they were still releasing

10   false information.

11          THE COURT:  So who pulled the trigger?

12          THE DEFENDANT:  Mr. -- how do you say his last

13   name?  Mike -- I don't even know now you say it.  Mencher.

14          We were both there.  I had an argument, a verbal

15   argument, exactly what I told Mr. Blake Childress, and if

16   you want to go back and listen to the recordings way from

17   the beginning, it is exactly like I told him.  I had a

18   verbal argument with him.  I didn't tell anybody to sit

19   there and wait for Anderson to leave.  There was no

20   testimony saying that I told anybody to sit there.  That

21   came directly from Mr. Bennett and Cody Wesling.  Neither

22   one of them said I told them to stay.  I already left,

23   because I didn't see him there.

24          And what occurred that day, I was actually working

25   right there in that area.  I have a buddy who owns a towing

1  service where he was at, at the location.  Unfortunately

2  I had to make the right, and wherever he was at, at like a

3  building right there, I ended up stopping because my food

4  ended up dropping in my vehicle, and I had the windows down,

5  Mr. Anderson and Gene Lasker was out there, I believe his

6  wife was out there, or some lady, whoever she was, with

7  black hair, and there was a bunch of other gentlemen out

8  there.  I don't know what the business was at the time,

9  didn't know that was his business until I started reading

10  reports.

11       Unfortunately Mr. Anderson was out there.  I was

12  parked right there in the middle of the road trying to get

13  my food out the van, Anderson seen me, of course they knew

14  my van because of the previous incident that happened with

15  Mr. Costa, they showed all my pictures of my vehicles and

16  stuff.

17       Mr. Anderson started coming out towards the road,

18  he grabbed the bottle out the back of his truck, which I

19  told Mr. Blake Childress that, that it was in a cooler, and

20  the evidence has showed the same thing.  He threw the bottle

21  at my van, he got pissed and he just said, you're dead,

22  mother fucker, and I wasn't fixing to step out of the van

23  just because of the incident when I got jumped down in Miami

24  at the time with me and another member.  There was no gun

25  that was pulled down there.

1          So I went back, I told my brother -- I called him

2     and I was like, yo, I'm pissed.  I'm tired of this shit.

3          He's like, what are you going to do?

4          I said, I'm going to go address him, I'm going to

5     fight him.  It's either we're going to talk about it or

6     we're going to fight, one of the two, and that's that.  I'm

7     known for fighting.  I mean, the Outlaws know that.  I mean,

8     there's no hiding that.  I've been in plenty of fights with

9     these dudes before, I mean, but it's never came to this

10    extent, to what happened.

11         So I went back and I didn't see him and me and

12    Mencher kept riding.

13         Now, whatever happened after we passed the

14    building, I don't know because I wasn't there.

15         We started heading back towards Hillsborough

16    Avenue, Mencher got a phone call, I guess Allan or somebody

17    was following or followed or something, I wasn't there, like

18    I said, I was on my own motorcycle.  So Mencher got the

19    phone call.  As we started heading up, he said, yo, I got to

20    go to my mom's house anyways.  And all this can be proven

21    right through the recordings all the way from the time we

22    got arrested, through the jail calls.  He said, I got to go

23    to my mom's house up there anyway, so we'll just ride up

24    that way.

25         We ended up getting off the exit.

```
 1   Unfortunately -- like we were making a right, I guess, right
 2   there at 54, and he was like in the left lane or center, and
 3   I was a little bit ahead, Mencher was like kind of side or
 4   whatever you want to call it, on the side of me, and
 5   I happened to look, and Mr. Anderson was like screaming
 6   through, and I can hear him because my bike is not really
 7   that loud, so I can hear him, and I look and I started
 8   talking shit back to him, and next thing I know -- and this
 9   can -- you can go all back through the reports, all I see is
10   like a hand point up.  So Paul pointed up and I yelled,
11   I was like, yo, he's pulling, he's pulling.  As soon as that
12   happened, it just -- within five seconds shots started
13   ringing out.  And what he had in his hand at the time --
14   which once I got to see all the discovery of January 14th of
15   '19, when I finally got approved to use the laptop to go
16   through everything, he had his phone in his hand, and that's
17   what it was.
18              THE COURT:  Thank you.
19              THE DEFENDANT:  But there's a couple more things.
20              Like I said, you know, I didn't lie at all.
21   I never sat here and lied in front of you.  I never sat here
22   and lied in front of these three, which got lied to the
23   whole time by these same people that got a 5K1.  I never
24   lied at all.  I can't take the stand against Mr. Mencher and
25   I couldn't take the stand against the Outlaws, I mean,
```

1   because at the same time, I mean, there's already reports

2   out there that's kill me on sight, kill my family on sight,

3   so what do I do?  I mean, Mencher is a Dirty White Boy.

4   They're a big gang in the prison system.  I mean, then you

5   got the Charlies that run with the Aryan Brothers, so

6   I mean, what do I do?  I just shut my fucking mouth and I

7   just pray to God whatever happens happens.  If I got to go

8   up the road, I go up the road and I come back on it.

9           But at the same time, like I said, there's no

10  excuse.  I was the one that wanted to go fight him.  And

11  just like the new evidence -- testimony that Mr. Wesling was

12  holding back to the very end, you know, Ms. Natalie asked

13  him, why did you hold this evidence back?  This case could

14  have went totally different if he would have just spoke up

15  and said, yo, this is what it was, instead of letting all

16  the lies come out.  And they admitted that they were lying,

17  and Guinto sat there and just kept lying and lying and

18  lying, then they both admitted it, I mean, in front of you,

19  Your Honor, I mean, you heard it, that they were lying about

20  everything and they didn't get impeached.

21          And then, you know, as I'm looking through the

22  evidence, I noticed that the Government didn't hand over

23  some video surveillance in time.  There was a couple of

24  videos in, what do you call it, the exhibit -- exhibit list

25  that I haven't even seen before, where they showed us going

1   up to a stop sign and I guess the Pasco County -- the guy

2   that did the video said I was handling over a firearm.  I'm

3   right-handed.  If you ride a motorcycle, the gas is on the

4   right side, and you clearly see my hands are like this.

5   I don't hand nothing to Mr. Mencher, period, in that video.

6           And if you -- if you paid attention very closely,

7   if the jurors or whatever paid attention, they said I hand

8   him over a firearm, and in their recordings Mencher is

9   saying that I gave him a firearm, but then again Alan said

10  I gave him a firearm.  How can I give him a firearm if

11  Mencher is already saying he's got a firearm and then they

12  got video surveillance with him tucking something in his

13  waistband?  It just -- there's a lot of things -- I felt

14  like I didn't get a fair trial, period.

15          I mean, like I said, with all the -- the news

16  media and releasing all the fake reports and then with

17  Mr. Robinson coming to testify on his behalf about being

18  directly behind Mr. Anderson, which was -- it was very true,

19  he was there, I mean, of course we seen it in the trial,

20  yeah, you know, there's video surveillance not only from the

21  officers but he also took pictures off his own phone being

22  directly behind him.  Cody said he was right behind him.

23  Cody was never behind him.  Cody kept going, because the

24  traffic that was going west -- or, I'm sorry, that was going

25  east, he had the green light and Cody pulled away off before

```
1    us, and the traffic -- it was coming from east -- I'm sorry,

2    from west to east on the other side of the Veterans was

3    going back north, they had the green light to go north on

4    the Veterans, so we ended up getting stopped by two vehicles

5    that was in front of us.

6              So there was a lot of like inconsistencies --

7    I think that's how you say that -- in this whole case and

8    that's why I'm kind of like really flabbergast.  Like I

9    said, at the end of the day, you know, I don't have no

10   excuse, because I was there.  I'm the only one out of all

11   five of us that never said I was not there.  I mean, that

12   I'm not going to deny.  I was there, I mean, as plain as

13   day, but what occurred is not -- that was not my intentions

14   whatsoever, and everybody that testified never said one time

15   that I told them we were going to go kill Mr. Anderson.

16   Nobody ever said that.

17             THE COURT:  Thank you, sir.

18             Is there anything else, Mr. Wise?

19             MR. WISE:  No, Your Honor.  Thank you.

20             THE COURT:  Does the Government wish to respond?

21             MR. GAMMONS:  Your Honor, may I have one moment?

22             THE COURT:  You may.

23             MR. GAMMONS:  May I just have a couple minutes,

24   Your Honor?

25             MR. WISE:  Your Honor, in the interim,
```

1   Mr. Cosimano indicated there was one other issue he would

2   like to discuss with the Court.

3              THE COURT:  Very briefly.

4              MR. WISE:  Yes.

5              THE DEFENDANT:  Yes, ma'am.  There's one thing

6   that I definitely want to bring up to your attention that

7   has not been brought up to you, period, but it has been

8   blasted over the news media once again.

9              I didn't find this out until 2019, January 14th.

10  There was reports, I guess, that Pasco County went to

11  Mr. Anderson's home and addressed him literally like three

12  or four days after the Costa incident and went and addressed

13  him and gave him my first, middle name and last name and my

14  nickname as Durty and told him that they had -- somebody

15  told him that I was planning on killing him, and the only

16  way I got to find out about this information is through the

17  reports, through the search warrants.  And then they claim

18  they came and talked to me.  I never even been pulled over

19  by Pasco County for a speeding ticket.  This is the first

20  time I ever had an encounter with Pasco County, is with this

21  case right here.

22             THE COURT:  Thank you.

23             Mr. Gammons?

24             MR. GAMMONS:  Your Honor, I just received a letter

25  from Mr. Anderson's sister, Annette Anderson.  May I make it

1  part of the record, if there's no objection?

2          THE COURT:  You may.  Is she present?

3          MR. GAMMONS:  She's not present, Your Honor.

4          THE COURT:  All right.

5          MR. GAMMONS:  May I approach?

6          THE COURT:  You may.

7          MR. GAMMONS:  Ms. Maureen Anderson,

8  Paul Anderson's mother, is also in the courtroom.  She has

9  provided me with three photos and I'd like to make them a

10  part of the record as well.

11          THE COURT:  Thank you.

12          MR. GAMMONS:  May I approach, Your Honor?

13          THE COURT:  Yes.

14          MR. GAMMONS:  As I mentioned, Your Honor,

15  Ms. Maureen --

16          THE COURT:  One second.  Let me read the letter.

17          Yes, sir.

18          MR. GAMMONS:  As I mentioned, Paul Anderson's

19  mother, Ms. Maureen Anderson, is here.  I've met with her

20  personally and I know this is very difficult for her.

21  Ms. Anderson doesn't want to speak today, but she provided a

22  brief statement.

23          In summary, Ms. Anderson says that she loved her

24  son very much.  He loved her very much.  He was a good man.

25  He was a soldier in the Army, an Army Ranger who received

1    several awards.

2          Your Honor, in this case the Government is asking

3    for the mandatory minimum sentence of life to be followed by

4    ten years consecutive for Mr. Cosimano.

5          As the Court knows, Mr. Cosimano was the President

6    of the Tampa chapter of the 69'ers.  He was an active

7    participant in the beef between the Outlaws and the 69'ers,

8    he was the one who made the oath that he would take the

9    lives of two Outlaws after the Local Brewing Company fight,

10   and we know that he followed through on that threat on

11   December 17th when he brazenly murdered Paul Anderson in

12   rush hour traffic in broad daylight.

13         Again, going back to the 3553 factors, I think all

14   of the factors militate in favor of a sentence of life in

15   prison to be followed by ten years.

16         THE COURT:  Thank you.

17         Anything further from the defense?

18         MR. WISE:  No, Your Honor, only that I would

19   ask -- based on the 3553(a) factors we discussed in the

20   memorandum, I would ask the Court to impose the statutory

21   minimum sentence, which is still a very, very substantial

22   sentence.

23         THE COURT:  All right.  The Court has reviewed the

24   letter submitted by Annette Anderson on behalf of her

25   brother.  Was Annette the writer or is Maureen the writer?

1  Maureen is the mother?

2          MR. GAMMONS:  Maureen is the mother.  I believe

3  Annette is the writer.

4          THE COURT:  So Annette Anderson writes on behalf

5  of her brother, and I have reviewed the photographs

6  submitted by the family and I've been heard the statement as

7  presented through the Government's counsel on behalf of the

8  decedent, Mr. Anderson.  I've considered the parties'

9  arguments, I have read the presentence report, I have

10 considered the statement of Mr. Cosimano, I have also

11 considered binding legal precedent, including the statute

12 and the Eleventh Circuit case law construing that statute,

13 which binds this Court, and as I indicated initially,

14 I reject the argument of the defense to overcome the effect

15 of the statute on the basis of any disparity between the

16 Florida murder statute and the Federal murder in aid of

17 racketeering law.

18          Would you please stand, sir.

19          Pursuant to Title 18, United States Code, Section

20 3551 and 3553, it is the judgment of this Court that this

21 defendant, Christopher Brian Cosimano, is hereby committed

22 to the custody of the Bureau of Prisons to be incarcerated

23 for a term of life plus ten consecutive years to follow.

24 This consists of a ten year term on Count One and a life

25 term on Count Two, to run concurrently, and a ten year

1   consecutive sentence as to Count Three to run consecutively

2   to the sentences imposed in Counts One and Two.

3            You may be seated.

4            The defendant is subject to a five year term of

5   supervised release, as to Count One three years and as to

6   Counts Two and Three five years, to run concurrently,

7   largely mooted by the effect of the life sentence and the

8   ten year consecutive just imposed.  If he were on supervised

9   release he would be subject to the mandatory and standard

10  conditions of the Middle District of Florida.

11           The defendant is a convicted felon, so he must

12  cooperate in the collection of DNA as directed.

13           The defendant is ordered to pay a special

14  assessment of $300, which is 100 for each offense.

15           Is the defendant requesting special placement?

16           MR. WISE:  Your Honor, he would ask you to

17  consider a recommendation for Fort Dix.

18           THE COURT:  Why?

19           MR. WISE:  Primarily, Your Honor, because of

20  concerns with threats within the BOP system, and being in

21  that area, he believes that those threats would be lessened.

22           THE COURT:  The Court would recommend that the

23  defendant be placed at Fort Dix out of safety concerns.

24  Ultimately though, Mr. Cosimano, the decision of where to

25  place you is left to the BOP and the BOP will make decisions

1  because your safety is important to BOP, not only for you

2  but for any officer that might be affected collaterally by

3  any attempts to attack you.

4          Having considered the advisory sentencing

5  guidelines and all of the factors identified therein, the

6  Court finds that the sentence is sufficient but not greater

7  than necessary to comply with statutory purposes of

8  sentencing.  In any event the sentence is mandated by

9  binding statutory and case precedent.

10          Is the Government seeking forfeiture?

11          MR. GAMMONS:  No, Your Honor.

12          THE COURT:  It is ordered that the underlying

13  indictments be dismissed as to this defendant.

14          The Court having pronounced sentence, does counsel

15  for the defense object to the sentence or the manner in

16  which it was pronounced?

17          MR. WISE:  None other than objections previously

18  made.

19          THE COURT:  Any objection from the Government?

20          MR. GAMMONS:  No, Your Honor.

21          THE COURT:  The defendant is remanded to the

22  custody of the United States Marshal to await designation by

23  the Bureau of Prisons.

24          Sir, you have 14 days from the date the judgment

25  is entered to file any appeal.

1          Mr. Wise, will you stay on for the purpose of

2     appeal?

3          MR. WISE:  Yes, Your Honor.

4          THE COURT:  All right.  You need to file a notice

5     of appeal timely.  If your client chooses not to appeal,

6     please get that decision in writing so that it cannot later

7     be argued that he asked you to take an appeal that you did

8     not take.

9          The Government, of course, is free to file an

10    appeal if it chooses.

11         The Court will continue to afford the defendant

12    the right to counsel in the taking of and defense of any

13    appeal, and the Court would direct the Clerk to accept the

14    notice of appeal without a fee because I find that the

15    defendant is indigent based upon the information in the

16    presentence report.

17         Is there anything further from the Government?

18         MR. GAMMONS:  No, Your Honor.

19         THE COURT:  From the defense?

20         MR. WISE:  No, Your Honor.

21         THE COURT:  Thank you.

22         Do you wish to have these original photographs

23    back?

24         MR. GAMMONS:  Yes, Your Honor.

25         THE COURT:  All right.  I'll have my staff make a

1   copy so that they can be made a part of the record, and then

2   we'll give the original back to you in a second.

3                   MR. GAMMONS:  Thank you, Your Honor.

4                   THE COURT:  Thank you.  We're dismissed.

5                           -  -  -  -  -

6               (Proceedings concluded at 9:47 a.m.)

7                           -  -  -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3          This is to certify that the foregoing transcript

4    of proceedings taken in a sentencing hearing in the United

5    States District Court is a true and accurate transcript of

6    the proceedings taken by me in machine shorthand and

7    transcribed by computer under my supervision, this the 10th

8    day of February, 2020.

9

10

11                                   /S/ DAVID J. COLLIER

12

13                                   DAVID J. COLLIER

14                                   OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25